JULIAN S. DANENBERG AND MABEL S. DANENBERG, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2103–76.     Filed November 27, 1979.

*Charles A. Pinney, Jr.,* and *Clifford C. Caldwell,* for the petitioners.

*Charles W. Jeglikowski,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency of $64,683.60 in the petitioners' Federal income tax for 1971 and an

addition to tax of $32,341.80 under section 6653(b) of the Internal Revenue Code of 1954.[1] The Commissioner has conceded certain issues, and the issues remaining for decision are: (1) Whether the petitioners must recognize gain or loss as a result of the disposition of certain of their properties which had been given as collateral for their indebtedness even though they were insolvent at the time of such disposition; (2) whether the petitioner's transfer of his stock in a 'subchapter S corporation before the end of the taxable year of such corporation to take effect after the end of such taxable year relieves him of the requirement of section 1373 of including the undistributed taxable income of the corporation in his gross income; and (3) whether any part of the underpayment of tax for the year in issue was due to fraud with the intent to evade tax within the meaning of section 6653(b).

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Julian S. Danenberg and Mabel S. Danenberg, husband and wife, maintained their legal residence in Holtville, Calif., at the time they filed their petition in this case. They filed their joint Federal income tax return for 1971 with the Internal Revenue Service, Fresno, Calif. The petitioners maintained their books and records on the cash method of accounting, and they filed their income tax return on a calendar year basis. Mr. Danenberg will sometimes be referred to as the petitioner.

The petitioner was a farmer in the Imperial Valley of California. During the period from October 1963 through June 1971, he obtained financing for his farming and cattle operations from the United California Bank (UCB or the bank). UCB made loans to the petitioner on real estate, farm equipment, and 37 separate crops, and it held certain property of the petitioner as collateral for the loans. Such collateral included the crops of the petitioner, certain farm equipment, the petitioner's stock in the Farmer's Tractor Co., his accounts receivable, an assignment of rents, and all the stock in the Meloland Cattle Co. (Meloland). The bank also held as collateral and had trust deeds for certain

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue, unless otherwise indicated.

real property owned by the petitioner, including six commercial lots located in El Centro, Calif. (the six lots), improved real estate consisting of an onion shed, a labor camp, and approximately 35 acres of land (the onion shed property), and the petitioner's residence in El Centro, Calif. None of the collateral held by the bank constituted security for "purchase-money" obligations, and in none of the loans to the petitioner did the bank assign a specific value to any of the items of collateral at the time of making the loan. However, subsequently, the bank did make appraisals of the collateral for the purpose of estimating the amounts that could be realized in the event of a foreclosure. The petitioner and Meloland also executed cross-collateralization and cross-guarantee agreements to support the bank's extension of credit to him. Meloland provided UCB with a continuing guarantee up to $4 million for the petitioner's personal debt, and the petitioner provided UCB with a personal guarantee for Meloland's corporate loans.

Sometime in May 1970, the petitioner met with officials of UCB to discuss his financing with the bank. At that time, UCB informed him that it would no longer finance his farming operations because his accumulated debts were so great that they no longer constituted a bankable loan. At another meeting with the bank officials in July 1970, the petitioner stated that he was forming a new corporation to take over his farming operations, and he proposed that such corporation be allowed to purchase for $150,000 the farm equipment which the bank held as collateral. The new corporation, California Farm Exchange, Inc. (CFE), was subsequently incorporated on August 11, 1970, and was funded by various third parties. The petitioner offered to negotiate with CFE for a lump-sum sale of all the farm equipment so that UCB would get more money than if it sold the equipment on a piece-meal basis at auction. Although the bank considered the purchase price to be reasonable, it was hesitant to accept the petitioner's proposal because it wanted more information regarding the capitalization of CFE. Subsequently, UCB acquiesced in the proposed sale to CFE, and CFE purchased the farm equipment from the petitioner for $157,500 on October 1, 1970. The bank had not instituted foreclosure proceedings against the farm equipment at the time of such sale to CFE. Under the terms of the sales arrangement, CFE made payments directly to the bank, and the bank applied such proceeds to

reduce the petitioner's debt. The petitioners reported a gain of $19,506.60 from the sale of the farm equipment on their 1970 income tax return.

In July 1970, the petitioner informed the bank that he was negotiating with seven other creditors to whom he owed approximately $300,200 for the purpose of arranging a settlement of their claims. He proposed to make them an immediate payment of $45,000 and additional payments at later dates. The petitioner informed the bank that such $45,000 would be provided by CFE and that the principals of CFE had agreed to such action. In late September 1970, a loan officer of UCB reviewed the petitioner's account and estimated that after all the petitioner's collateral had been liquidated and the proceeds were applied to his account, the bank would have a final loss of $800,000.

In December of 1970, John R. Fitch, a vice president of Associated Desert Newspapers, Inc. (the newspaper), called an official at UCB to inquire about purchasing the six lots for the newspaper. UCB told Mr. Fitch to get in touch with the petitioner, and Mr. Fitch met with the petitioner sometime in early January 1971 to discuss a possible sale agreement. All negotiations regarding the sale of the property were subject to the approval of UCB since it wanted to insure that the selling price of the six lots was reasonable and that it received all moneys realized from such sale. The bank also had control over the minimum price at which the lots could be sold. At that time, one of the petitioner's other creditors, Arizona Agro Chemical, had a lien on the property junior to UCB's lien. Before the petitioner could complete negotiations with Mr. Fitch, he made an arrangement with such company whereby they released its lien for no consideration. The petitioner and Mr. Fitch eventually agreed on a sales price of $58,500 for the six lots, and the bank considered such amount a reasonable selling price.

On or about January 25, 1971, an escrow account was opened with a title insurance company to carry out the sale of the six lots. On January 28, 1971, UCB executed a notice of default and election to sell the six lots and the onion shed property, and it recorded such notice on February 2, 1971. However, before the bank took any formal action to foreclose on the six lots, the sale arrangement with Mr. Fitch was consummated, and title to the property passed from Mr. and Mrs. Danenberg to the newspaper

on April 30, 1971. The title insurance company paid the proceeds of the sale, consisting of the $58,500 selling price less $960.84 selling costs, directly to UCB. The petitioner's basis in the six lots was $34,719.76; however, the petitioners did not report any gain from the sale of the six lots on their 1971 income tax return.

On March 24, 1971, the petitioner met with the officials of UCB to discuss the transfer of his interest in Meloland to the bank. The bank regarded the Meloland feedlot as the petitioner's major asset securing his loans. The petitioner had pledged the stock of Meloland to UCB in 1967, and he delivered stock certificate number 1 and executed a blank stock power to the bank at that time. The petitioner and the officials of UCB agreed that if he transferred his Meloland stock to a nominee of the bank, the bank would release the lien on his residence, would look only to the remaining collateral to satisfy his indebtedness, and would forego any deficiency judgment against him following the liquidation of such collateral.

Meloland was incorporated by the petitioner on November 13, 1962, as a small business corporation (subchapter S corporation) of which the petitioner was the sole stockholder. At the time of the petitioner's negotiations with the bank in 1971, Meloland was being managed by the Diamond A Cattle Co. (Diamond A) pursuant to an agreement with Diamond A's predecessor dated September 1, 1967. Diamond A also had an option to purchase 51 percent of the stock of Meloland from the petitioner. However, both the management agreement and option to purchase had a termination date of June 30, 1971.

In a letter dated April 19, 1971, Diamond A informed the petitioner that it would terminate its management contract with Meloland and its option to purchase the Meloland stock on June 30, 1971. When UCB was informed of Diamond A's intentions, it began to seek a buyer for the Meloland feedlot. Roy H. Mann, an attorney representing the bank, drew up an agreement whereby the petitioner was to transfer his interest in Meloland to a nominee of the bank. In an agreement dated May 26, 1971, the petitioner "sold, assigned and transferred" his stock in Meloland to Rummonds Bros. Ranch (Rummonds), the bank's nominee, subject to a pledge to the bank. However, the agreement provided that such transfer did not release, discharge, or diminish the liens that the bank had on the petitioner's other property. On such date, the petitioner also executed an assign-

ment separate from certificate transferring his stock in Meloland as represented by certificate number 1 to Rummonds, but the assignment contained a statement "This Assignment to be effective July 1, 1971."

Rummonds was an operating feedlot business at the time the petitioner transferred his Meloland stock to it, and Mr. Mann was its sole shareholder at such time. When Mr. Mann drafted the May 26, 1971, stock transfer agreement, it was his intention that such document was a binding agreement on the petitioner, with an effective date of July 1, 1971. Toward the end of July of that year, Mr. Mann still had not received certain corporate books and documents of Meloland from the petitioner. Consequently, on July 27, 1971, he wrote to the petitioner's attorney requesting him to send the stock book, minute book, journal ledger, and stock certificates of Meloland. Mr. Mann received stock certificate number 1 sometime in late July 1971, and stock certificate number 2, which transferred the stock of Meloland from the petitioner to Rummonds, was dated July 1, 1971, and was mailed to UCB on August 23, 1971. Mr. Mann received the other requested documents of Meloland sometime in August of that year.

UCB never placed a value on the Meloland stock when it took the stock as collateral for the petitioner's loans. However, subsequently when the bank decided that it would have to liquidate the petitioner's collateral, it considered the Meloland stock to be worth the amount that could be realized from the sale of the feedlot. The book value of the land and equipment of Meloland was $627,778 as of June 30, 1970. An appraisal the bank conducted on July 21, 1970, revealed that the physical value of such assets was $694,000 and that the loan value was $550,000. In March 1971, the petitioner estimated that the Meloland feedlot would bring approximately $600,000 in a sale and that the commodities of Meloland would bring $100,000. The balance sheet of Meloland on June 30, 1971, revealed that it had net assets of $704,579, comprised of $579,323 in property, plant, and equipment, and of $125,256 in cash and other assets; it had liabilities of $436,031 on such date. Thus, its total shareholder equity was $268,548 on such date.

After the transfer of the Meloland stock to Rummonds, Meloland continued to be liable for the petitioner's obligations to the bank, and Meloland made subsequent payments to UCB to

fulfill such liability. On February 5, 1973, a vice president at UCB informed the president of Meloland's successor corporation, Melcatco, that Meloland's continuing guarantee of $4 million for the petitioner's debts would be reduced to $500,000 upon their immediate payment of $144,810.27 to UCB. Melcatco paid such amount to UCB, and upon the insistence of the bank, it also agreed not to proceed against the petitioner for any amounts paid under such guarantee. Melcatco later paid $135,000 to UCB on February 11, 1974, and $30,000 on April 22, 1975, under the continuing guarantee of the petitioner's debts.

In a letter dated May 7, 1971, the bank notified Mrs. Danenberg that a trustee's sale of the onion shed property was scheduled for June 4, 1971. However, on or about May 28, 1971, an escrow account was opened with a title insurance company for the sale of the onion shed property by the petitioner to CFE. Consequently, the June 4 trustee's sale was postponed by UCB, as were three other trustee's sales—one scheduled in July 1971 and two in August 1971. The bank agreed to such postponements in order to allow the petitioner to negotiate the sale of the property to CFE with the expectation that it would receive a larger amount of money to apply against his debt. In connection with such transaction, UCB loaned CFE $75,000 to purchase the onion shed property, and the bank also asked the petitioner to have the principals of CFE provide a continuing guarantee for the loan. The onion shed property was subsequently sold to CFE on September 3, 1971, for $100,000. The proceeds of such sale were paid directly to the bank, and the bank applied such proceeds to reduce the petitioner's debt. The petitioner's adjusted basis in the onion shed property at the time of its sale to CFE was $103,853.12; nevertheless, the petitioners did not report any loss from such transaction on their 1971 income tax return.

When the petitioner transferred his Meloland stock to Rummonds effective as of July 1, 1971, at the request of UCB, he was indebted to UCB in the total amount of $1,328,266. However, after he transferred his stock to Rummonds, he was no longer obligated to repay UCB on his debt. Nevertheless, his indebtedness continued to remain on the books of UCB, and as the collateral the bank held was liquidated, the moneys received were applied to his indebtedness. The bank declared the remaining balance to be nonrecoverable sometime in 1977 after all the collateral had been liquidated.

The petitioners' individual income tax return for 1971 was prepared by Thomas A. Campbell, a certified public accountant. Mr. Campbell began preparing the petitioners' returns in 1958 or 1960. In preparing the petitioners' return for the year in issue, he relied solely on information furnished by the petitioner's bookkeeper, including certain information on tax forms, and he never verified any information with the petitioner. Mr. Campbell was not told about the sale of the six lots to the newspaper; he was under the impression that UCB had taken over everything in foreclosure proceedings. Mr. Campbell also prepared the petitioners' 1970 income tax return. On such return, he listed a gain of $19,506.60 resulting from the sale of the farm equipment to CFE. He also relied on the books and records furnished by the petitioner's bookkeeper in the preparation of the petitioners' 1970 tax return, and the sale of such farm equipment was revealed in such books and records. Mr. Campbell never maintained books and records for the petitioner, and the petitioner never asked Mr. Campbell any questions about his 1970 or 1971 income tax return.

Meloland filed a small business corporation income tax return on a fiscal year basis beginning July 1 and ending June 30,[2] and Mr. Campbell prepared such corporate tax return for its taxable year 1971 using information provided by Peat, Marwick, Mitchell & Co. He prepared such return on November 18, 1971, and the petitioner is listed as its 100-percent shareholder. Meloland reported taxable income of $38,319.58 for its fiscal year ending June 30, 1971. However, the petitioners did not report such amount on their 1971 individual income tax return.

During an Internal Revenue Service investigation of the petitioners' 1971 income tax liability, the petitioner's bookkeeper, in mid–1975, prepared a financial statement of his assets and liabilities as of 1971. The bookkeeper used information from the petitioner's accounting records, and Mr. Campbell reviewed the statement and made adjustments thereto. The statement prepared by them set forth the assets and liabilities as of June 30, 1971, as follows:

---

[2]We will refer to Meloland's taxable year by the calendar year in which it ends.

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash in bank: | | Cash in bank: | |
| Savings | $1,174.06 | UCB[1] | $1,769.36 |
| Bank of America | 638.00 | | |
| Mexican bank | 175,000.00 | | |
| Miscellaneous[1] | 450.20 | | |
| Accounts receivable: | | Accounts payable | 406,222.07 |
| Produce exchange | 29,519.76 | | |
| Danenberg properties | 57,411.70 | | |
| CFE | 2,509.92 | | |
| Miscellaneous | 1,500.00 | | |
| Loans receivable: | | Loans payable: | |
| Meloland[1] | 198,680.00 | UCB[1] | 1,161,267.45 |
| Deposits | 433.33 | UCB-R.E[1] | 114,500.00 |
| | | Cal. West | 8,557.37 |
| | | Miscellaneous | 25,000.00 |
| Investments: | | Contracts: | |
| Meloland[1] | 128,538.65 | Crocker National bank | 32,616.19 |
| Farmers Tractor Co[1] | 47,500.00 | Wilcox Manufacturing Co | 7,462.25 |
| Shippers service | 8,505.09 | | |
| Labels | 1,500.00 | | |
| Other: | | Other: | |
| Personal residence | 35,000.00 | Allowance for depreciation[1] | 157,863.47 |
| Land[1] | 32,851.10 | Mortgage on residence | 13,002.00 |
| Buildings[1] | 228,865.69 | Total | 1,928,260.16 |
| Total | 950,077.50 | | |

[1]Assets and liabilities taken over by UCB.

When Mr. Campbell reviewed such statement, he was unaware of many of the petitioners' personal assets, such as jewelry and furs, and he valued the petitioners' residence at cost rather than fair market value. Moreover, in a personal financial statement given by the petitioner to the Wells Fargo Bank on August 15, 1971, he listed assets including a life insurance policy, a note receivable in the amount of $45,000, and a one-half interest in a produce exchange building. None of these assets was included in the financial statement prepared by his bookkeeper for the IRS. The petitioner also maintained a bank account in Laredo, Tex., and the amount thereof was not reflected on the bookkeeper's financial statement. The following chart is a summary of additional assets which the petitioners owned, or may have owned, on June 30, 1971:

### Additional assets

| | |
|---|---|
| Note receivable | $45,000.00 |
| Life insurance policy (cash-surrender value) | 8,559.00 |
| Jewelry | 12,000.00 |
| Two fur coats | 15,000.00 |
| Laredo bank account | 5,098.85 |
| Adjustment to value of petitioners' residence[1] | 12,900.00 |
| One-half interest in produce exchange building[2] | 31,675.00 |
| Total | 130,232.85 |

[1]The petitioner testified that a city assessor valued his residence at $47,900 as of June 30, 1971. Therefore, such amount, minus the $35,000 figure reported on the financial statement, results in a $12,900 increase.

[2]The petitioner testified that a city assessor valued such property at $81,080 as of June 30, 1971, and that his interest was subject to an $8,865 mortgage.

If such total additional assets are added to the assets listed on the financial statement prepared by his bookkeeper, the petitioner's liabilities exceed his assets by $847,949.81.

In his notice of deficiency, the Commissioner determined that the petitioners realized a long-term capital gain from the sale of the six lots measured by the difference between the net proceeds of the sale and the petitioner's basis of $11,000 for the property; but the Commissioner now concedes that the petitioner's basis in the property is $34,719.76. The Commissioner also determined that the petitioners realized a long-term capital gain of $757,465.04 from the transfer of their Meloland stock to Rummonds; in computing such gain, he concluded that the selling price of the stock was $1,123,003.04 and that their basis in such stock was $365,538. In the notice of deficiency, the Commissioner further determined that the petitioners realized a long-term capital gain from the sale of the onion shed property; for such purpose, he treated their basis as $71,002.02, but he now concedes that their basis in such property is $103,853.12 and asserts that they realized a long-term capital loss of $3,853.12 from such transaction. He also determined that the petitioners failed to report on their 1971 income tax return Mr. Danenberg's share of the undistributed taxable income of Meloland for its fiscal year ending June 30, 1971, in the amount of $38,319.58. Finally, the Commissioner imposed the 50-percent addition to tax under section 6653(b) for fraud with intent to evade tax.

## OPINION

The first issue for decision is whether the petitioners are

required to recognize gain or loss from the disposition of the six lots, the Meloland stock, and the onion shed property. The petitioner contends that such properties were transferred to UCB in connection with the bank's foreclosure on such properties and that after such transfers, the bank forgave his debts. He claims that the transactions were not sales of the collateral by him but that such transactions were integral parts of the cancellation of all the petitioner's indebtedness to the bank. He maintains that his position is buttressed by the fact that he never received the proceeds from the disposition of the properties, that the bank never assigned a specific value to the individual assets which it held as collateral, and that none of the bank's loans to him were purchase-money mortgages. He further contends that any income he may have realized from the forgiveness of his debts is not to be recognized because he was insolvent at the time of such forgiveness.

On the other hand, the Commissioner contends that the transfers of the petitioner's properties constitute "sales or exchanges" which are subject to the recognition provisions of section 1002. He maintains that the petitioner realized a gain (or loss) from the transfers to the extent the amount realized from the transfer exceeded (or was less than) his adjusted basis in the property. The Commissioner contends that the "amount realized" was the amount of the proceeds which the petitioner directed be paid to UCB to satisfy his indebtedness. Lastly, he maintains that the defense of insolvency is inapplicable to the recognition provisions of section 1002. We must agree with the Commissioner.

The issue we must consider is not whether an insolvent taxpayer realized income from the discharge or forgiveness of indebtedness. See, e.g., *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931); *Lakeland Grocery Co. v. Commissioner*, 36 B.T.A. 289 (1937). Rather, the issue to be decided is whether an insolvent taxpayer is required to recognize gain or loss under section 1002 from the sale or exchange of property. See *Lutz & Schramm Co. v. Commissioner*, 1 T.C. 682, 689 (1943).

Case law is clear that when a debt is discharged or reduced upon the debtor's transfer of property to his creditor or a third party, such transaction is treated as a sale or exchange of the

debtor's assets, and not as a mere transfer of assets in cancellation of indebtedness.[3] *Bialock v. Commissioner*, 35 T.C. 649, 660 (1961); *R. O'Dell & Sons Co. v. Commissioner*, 8 T.C. 1165, 1167 (1947), affd. 169 F.2d 247 (3d Cir. 1948); *Lutz & Schramm Co. v. Commissioner, supra; Peninsula Properties Co., Ltd. v. Commissioner*, 47 B.T.A. 84, 91 (1942); *Carlisle Packing Co. v. Commissioner*, 29 B.T.A. 514, 515 (1933). As this Court stated in *R. O'Dell & Sons Co. v. Commissioner, supra* at 1167:

If an owner sells property for more than its basis, the assumption that there has been a taxable gain follows almost inevitably. This is as true where the consideration received is property as where it is cash. Sometimes, the transaction involves an atypical sort of consideration such as release of the transferor's indebtedness. That does not prevent the transfer from being a sale or exchange resulting in capital gain or loss. * * *

The commentators have observed that there are various methods of satisfying indebtedness, and each method produces different tax consequences:

The form of income created by a discharge of indebtedness depends generally upon the consideration given by the debtor for the discharge and the facts and circumstances surrounding the transaction. For example, if the debtor effectuates a discharge by a payment in money or the equivalent of money, any gain on the transaction is considered to be cancellation of indebtedness income. * * * However, it is possible to discharge a debt in a variety of ways: e.g., by the performance of services; by the transfer of property other than money; or by any other agreement deemed effective by the parties to extinguish the debt. Thus the particular facts or circumstances of the transaction will determine whether the realized income is compensation, gain on the disposition of property, rent, dividends, or simply cancellation of indebtedness income. [J. Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225, 231 (1959).]

The commentators have also recognized that when the fair market value of property transferred is less than the amount of debt discharged, a separate tax issue of gain or loss on the disposition of property is raised:

If rather than paying cash to discharge an obligation the debtor transfers other assets with a value less than the face amount of the debt, the difference should constitute income to the debtor under the *Kirby Lumber* principle. If the debtor's basis in the property differs from its fair market value at the

---

[3] Only one case treated such a transaction as a surrender in cancellation of indebtedness. *Turney's Estate v. Commissioner*, 126 F.2d 712 (5th Cir. 1942), revg. a Memorandum Opinion of this Court. However, the result in such case is inconsistent with all other cases and has not been followed in later cases.

time of transfer, the transaction simultaneously raises a separate tax issue of gain or loss on the disposition of property, for the transaction could be considered equivalent to selling the property for its fair market value and then using the proceeds to discharge the debt. [B. Bittker & B. Thompson, "Income from the Discharge of Indebtedness: The Progeny of *United States v. Kirby Lumber Co.*," 66 Cal. L. Rev. 1159, 1172 (1978).]

The facts of this case clearly indicate that the petitioner was involved in two separate transactions each time he disposed of the assets held by UCB as collateral: (1) There was an initial transaction whereby he disposed of such properties through a sales arrangement with a third party; and (2) there was a second transaction whereby the proceeds of the sale were paid to the bank and applied to reduce the amount of his indebtedness, and after all the collateral of the petitioner had been liquidated, the balance of his outstanding loan was forgiven by the bank.

The record overwhelmingly establishes that the transactions whereby the petitioner disposed of the assets held as collateral by the bank were indeed sales of such assets. Although UCB may have had the power of controlling the final selling price, the petitioner was active in arranging the disposition of such assets. He conducted the negotiations with Mr. Fitch for the sale of the six lots, and he dealt with the principals of CFE for the sale of the onion shed property. The bank postponed four trustee sales to allow the petitioner to conduct his negotiations with CFE concerning such sale. The petitioner was active in the general settlement of his debts with other creditors in 1970 and 1971; such conduct also indicates that the petitioner's arrangements for the disposition of the collateral were not merely passive settlements with UCB. The evidence in the record in this case also indicates that both the bank and the petitioner perceived that the disposition of the six lots, the onion shed property, and the Meloland stock were *sales* of such collateral.

Moreover, the fact that such transactions may have taken place under the threat of foreclosure proceedings instituted by the bank is irrelevant to the determination of whether the petitioner is required to recognize a gain or loss. The Supreme Court in *Helvering v. Hammel*, 311 U.S. 504 (1941), and its companion case of *Electro-Chemical Engraving Co. v. Commissioner*, 311 U.S. 513 (1941), did away with the distinction between forced and voluntary sales. A voluntary sale and a mortgage foreclosure are both "dispositions" within the scope of the gain or loss provisions of section 1001.

It is also irrelevant that no specific value was applied to each item of the petitioner's collateral, that none of the bank's loans were purchase-money mortgages, or that the petitioner never received the proceeds from the various transactions. As a result of each transaction, the petitioner received the benefit of having the proceeds applied to his debts, and except in the case of the transfer of the Meloland stock to Rummonds, the amount of the benefit was defined. It makes no difference that the petitioner directed the purchasers of the assets to forward the money directly to the bank. See, e.g., *Peninsula Properties Co., Ltd. v. Commissioner*, 47 B.T.A. at 91. Such action was merely for the convenience of the parties to the transactions. The sale of the six lots to the newspaper, the sale of the onion shed property to CFE, and the transfer of the Meloland stock to Rummonds were no different from the sale of the farm equipment to CFE in October 1970. The petitioner recognized that such transfer of the farm equipment constituted a sale, and he reported the gain realized from such sale on his 1970 income tax return. As this Court stated in *Peninsula Properties Co., Ltd. v. Commissioner*, *supra* at 91: "In each case the transaction is treated as if the transferor had sold the asset for cash equivalent * * * and had applied the cash to the payment of the debt."

Lastly, the petitioner's reliance on *Liberty Mirror Works v. Commissioner*, 3 T.C. 1018 (1944), is misplaced. In *Liberty Mirror*, the bank held a mortgage on the taxpayer's property to secure a loan. As part of its settlement with the bank, the taxpayer agreed to forward the proceeds from the sale of such property to the bank, and since the taxpayer's debt exceeded the proceeds from the sale, the bank agreed to cancel the taxpayer's remaining indebtedness. This Court held that the cancellation of the taxpayer's remaining indebtedness constituted a gift and that, therefore, the taxpayer realized no income. The Court did not consider the issue of whether the taxpayer was required to recognize a gain or loss on the sale of such property to the third party; it is that issue that we must decide in the petitioner's case.

We now reach the primary issue in this case of whether the

insolvency of a taxpayer relieves him of the requirement of section 1002[4] that he recognize a gain or loss on the disposition of property. Section 1001(a) provides:

The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

Section 1001(b) defines "amount realized" as "the sum of any money received plus the fair market value of the property (other than money) received." Section 1002 provided "Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized."

The petitioner contends that any gain or loss that he may have realized on the disposition of his property is not recognized because the "Except" phrase of section 1002, read in conjunction with section 1.61–12(b)(1), Income Tax Regs., "exempts by implication" the recognition of gain or loss in the case of an insolvent taxpayer. We must disagree with the petitioner.

Section 1.61–12(b)(1) provides in part:

Income is not realized by a taxpayer by virtue of the discharge * * * of his indebtedness * * * by virtue of an agreement among his creditors not consummated under any provision of the Bankruptcy Act, if immediately thereafter the taxpayer's liabilities exceed the value of his assets. * * *

Section 1.61–12(b)(1) sets forth the law regarding the realization of income through the *forgiveness of indebtedness* of an insolvent taxpayer; such section has no bearing on the recognition of gain or loss on the *sale* or disposition of property by an insolvent taxpayer. Moreover, the petitioner's contention that the insolvency of the debtor precludes recognition of gain or loss under section 1002 is inconsistent with the language and intent of the regulations under such section. Section 1.1002–1(b) and (c), Income Tax Regs., provides in part:

(b) *Strict construction of exceptions from general rule.* The exceptions from the general rule requiring the recognition of all gains and losses, like other exceptions from a rule of taxation of general and uniform application, are *strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception.* Nonrecognition is accorded by the

---

[4]Sec. 1002 was repealed by the Tax Reform Act of 1976, Pub. L. 94–455, sec. 1901, 90 Stat. 1799, and similar language now appears in sec. 1001(c), effective for taxable years beginning after Dec. 31, 1976.

Code only if the exchange is one which satisfies both (1) the specific description in the Code of an excepted exchange, and (2) the underlying purpose for which such exchange is excepted from the general rule. * * * As elsewhere, the taxpayer claiming the benefit of the exception must show himself within the exception.

(c) *Certain exceptions to general rule.* Exceptions to the general rule are made, for example, by sections 351(a), 354, 361(a), 371(a)(1), 371(b)(1), 721, 1031, 1035 and 1036. These sections describe certain specific exchanges of property in which at the time of the exchange particular differences exist between the property parted with and the property acquired, but such differences are more formal than substantial. As to these, the Code provides that such differences shall not be deemed controlling, and that gain or loss shall not be recognized at the time of the exchange. The underlying assumption of these exceptions is that the new property is substantially a continuation of the old investment still unliquidated; and, in the case of reorganizations, that the new enterprise, the new corporate structure, and the new property are substantially continuations of the old still unliquidated.

[Emphasis supplied.]

The proposition that the exceptions to the general rule of taxation must be strictly construed has generally been accepted and applied by the courts. *Bank of Commerce v. Tennessee,* 161 U.S. 134, 146 (1896); *Cappel House Furnishing Co. v. United States,* 244 F.2d 525, 529 (6th Cir. 1957). Moreover, section 1.1002-1(c) does not include the insolvency of a debtor as an exception within its purview. The situations which are exempted from the recognition provision are those in which the recognition of gain or loss is merely *postponed* until a later taxable disposition of the property. In the present case, the petitioners are not seeking merely a postponement of the recognition of gain; they are seeking a complete exemption of such gain. There is no "later disposition" of the property by the taxpayer. The final disposition of the properties by the petitioner occurred when he transferred such properties to the various third parties, and it is such final disposition on which the petitioner is taxable. See *Woodsam Associates v. Commissioner,* 198 F.2d 357, 359 (2d Cir. 1952), affg. 16 T.C. 649 (1951) (realization of gain postponed for taxation until there was a final disposition of the property at the time of the foreclosure sale).

Finally, although this precise situation appears not to have been adjudicated in the past, the commentators have recognized that although insolvency would preclude the realization of income resulting from the cancellation of indebtedness, insolven-

cy would not eliminate gain when the transaction involved is a separate sale of property:

The question whether a transfer of property for the cancellation of indebtedness is simply a sale rather than forgiveness of an indebtedness is important where the debtor is insolvent. Insolvency would not eliminate the gain arising from a separate voluntary sale of property, whereas a mere cancellation of indebtedness might not result in income to an insolvent. [2 J. Mertens, Law of Federal Income Taxation, sec. 11.21, p. 119 n. 63 (1974 rev.).]

See also W. Warren & N. Sugarman, "Cancellation of Indebtedness and Its Tax Consequences: I," 40 Colum. L. Rev. 1326, 1353–1354 (1940); J. Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225, 234–235 (1959).

For such reasons, we hold that the petitioner realized a gain on the sale of the six lots to the newspaper, measured by the difference between the net proceeds paid to UCB on behalf of the petitioner and his basis in such property, and that he is required to recognize such gain under section 1002, subject to the provisions of section 1201 et seq., relating to capital gains and losses. We also hold that the petitioner realized a loss on the sale of the onion shed property to CFE, measured by the difference between the selling price and his adjusted basis in such property, and that such loss is recognizable under section 1002, subject to the provisions of section 1201 et seq., relating to capital gains and losses.

The transfer of the Meloland stock presents additional questions since actual cash proceeds were not transferred to UCB by a third party. Therefore, we must determine what amount the petitioner received as a result of the transfer of his Meloland stock. The Commissioner contends that, in exchange for his transfer of the Meloland stock, the petitioner received a discharge of the entire amount of his indebtedness to UCB at the time, that is, $1,123,003.04.[5] We find his position to be unsupported by the record.

The record is clear that UCB did not consider the petitioner's debt as having been satisfied by the transfer of his Meloland stock to Rummonds even though it released him from personal liability for such debt at that time. Indeed, the bank looked to

---

[5]According to the bank records, however, the petitioner was indebted to UCB in the amount of $1,328,266 when he transferred his stock to Rummonds on July 1, 1971.

Meloland and its successor corporation for further payments on the petitioner's debt under its continuing guarantee for his loans and actually collected such payments as late as April 1975. Moreover, in September 1970, when the bank began to consider the amount the petitioner's assets would bring in liquidation, it estimated that there would be a final loss of approximately $800,000 on the petitioner's account. In addition, Edward E. Gregg, a vice president of UCB, who was involved with the petitioner's account, testified that such stock was not worth over $1 million; and Mr. Mann, who was the sole shareholder of Rummonds at the time of the transfer of the Meloland stock, testified that Rummonds did not pay over $1 million for such stock. Therefore, it is clear that UCB did not regard the Meloland stock as satisfying the petitioner's total debt to the bank. We must then consider other methods of valuation to determine what amount the bank received upon the surrender of the petitioner's interest in Meloland.

For some purposes, the fair market value of stock is determined by examining the net worth and earnings potential of a corporation, but in this case, the parties to the transfer were not relying on a value so determined. The record in this case establishes that UCB considered the value of the physical assets of Meloland as the value it would receive upon the liquidation of the petitioner's stock. The bank hoped to find a buyer for the Meloland feedlot, and its appraisals of the Meloland stock were based on what it expected to realize on a sale of the physical assets of Meloland. Moreover, in March 1971, the petitioner estimated that the value of the Meloland stock was indicated by the amount for which the Meloland feedlot could be sold. Finally, the net worth of Meloland is not helpful in this case since the purpose of our inquiry is to determine the value of the property, in effect, transferred to UCB to be applied to the petitioner's indebtedness to it. Therefore, we consider only the value of the physical assets of Meloland on June 30, 1971, as the amount that UCB received when the petitioner surrendered his stock to its nominee.

Meloland's balance sheet revealed that its physical assets were worth $579,323 on June 30, 1971, and we find that such amount represents the value of such assets since we have no evidence to indicate otherwise. We hold that such amount was the amount transferred to UCB by the petitioner upon the surrender of his

stock to its nominee and that such amount constitutes the amount realized by the petitioner as a result of such transfer. For these reasons, we hold that as the result of the transfer of the Meloland stock, the petitioner is required to recognize under section 1002 a gain measured by the amount realized over his basis in such stock,[6] subject to the provisions of sections 1201 et seq., relating to capital gains and losses.

Next, we must consider whether the petitioner must recognize income from the discharge of indebtedness equal to the difference between his total indebtedness to UCB and the total amount of the collateral applied in partial satisfaction of such debt. It is a well-established principle that a debtor realizes no income from the discharge of indebtedness if he is insolvent both before and after such discharge. Sec. 1.61–12(b)(1), Income Tax Regs.; *Dallas Transfer & Terminal Warehouse Co. v. Commissioner*, 70 F.2d 95 (5th Cir. 1934), revg. 27 B.T.A. 651 (1933); *Astoria Marine Construction Co. v. Commissioner*, 12 T.C. 798 (1949); *Main Properties, Inc. v. Commissioner*, 4 T.C. 364 (1944); *Kramon Development Co. v. Commissioner*, 3 T.C. 342 (1944). However, the Commissioner contends that the petitioner has failed to present adequate evidence of insolvency. He maintains that the financial statement which the petitioner's bookkeeper prepared indicating his net worth on June 30, 1971, is incomplete and untrustworthy because many of the petitioner's personal assets were omitted, some assets were valued at cost instead of fair market value, and the petitioner did not certify the statement's authenticity and completeness. The Commissioner also claims that the petitioner gave a contradictory financial statement to the Wells Fargo Bank in August 1971 which indicated that he was solvent at that time.

The financial statement prepared by the petitioner's book-

---

[6]In his notice of deficiency, the Commissioner determined that the petitioner's basis in the Meloland stock was $365,538 computed as follows:

| | |
|---|---:|
| Capital stock | $10,000 |
| Additional paid-in capital | 150,000 |
| Undistributed 1120S taxable income | 6,858 |
| Loans to corporation | 198,680 |
| Total cost basis | 365,538 |

However, in the second issue in this case, we hold that the petitioner must include in income the undistributed taxable income of Meloland for 1971 in the amount of $38,319.58. Therefore, his basis in such stock should be adjusted under sec. 1376 to take into consideration the inclusion of such amount in his income.

keeper does have its shortcomings. However, Mr. Campbell, the certified public accountant who prepared the petitioners' income tax returns, made corrections that he felt were necessary to make the statement more accurately reflect the petitioner's net worth. Moreover, even if the assets which were omitted from the bookkeeper's statements are added to the assets listed on such statement, and even if the properties are valued at their fair market value, the liabilities of the petitioner far exceed his assets. As to the contradictory statement given by the petitioner to the Wells Fargo Bank, he testified that the figures listed on such statement are in error. He also implied that the bank officer at Wells Fargo was merely concerned with completing the statement without too much regard for accuracy so that the bank could process a loan to CFE. In the light of all these circumstances, we are satisfied and hold that the petitioner has sufficiently proved his insolvency on June 30, 1971. Accordingly, the petitioner did not realize any income resulting from the partial discharge of his indebtedness by UCB. See *Bialock v. Commissioner*, 35 T.C. 649 (1961).

The second issue for consideration is whether the petitioner was a shareholder of Meloland on June 30, 1971, and, therefore, should have included such corporation's undistributed taxable income in his gross income for 1971 under section 1373. Section 1373 provides in part:

(a) GENERAL RULE.—The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.

(b) AMOUNT INCLUDED IN GROSS INCOME.—Each person who is a shareholder of an electing small business corporation *on the last day of a taxable year of such corporation* shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation. [Emphasis supplied.]

The petitioner contends that he was no longer a shareholder of Meloland on June 30, 1971, the last day of its taxable year, because he had disposed of his stock on May 26, 1971, when he

signed the agreement to transfer such stock to Rummonds and executed an assignment separate from certificate to it.

The question of whether a taxpayer has made a valid transfer of property which is effective for Federal income tax purposes is an issue of fact. *Wilson v. Commissioner*, 560 F.2d 687, 690–691 (5th Cir. 1977), affg. a Memorandum Opinion of this Court. It is well established that for purposes of determining who is a shareholder under the provisions of subchapter S, beneficial ownership of the stock rather than technical legal title is controlling (*Hoffman v. Commissioner*, 47 T.C. 218 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968); *Kean v. Commissioner*, 51 T.C. 337 (1968), affd. on this issue 469 F.2d 1183 (9th Cir. 1972)), and the incidents of taxation are determined by the real ownership of the stock, and not where mere naked title lies (see *Rupe Investment Corp. v. Commissioner*, 30 T.C. 240 (1958), affd. 266 F.2d 624 (5th Cir. 1959); *Stiefel v. Commissioner*, 9 T.C. 576 (1947)). The evidence on this issue overwhelmingly indicates that the petitioner was the sole shareholder of Meloland on June 30, 1971, since the assignment separate from certificate, executed on May 26, 1971, was not to take effect until after June 30 of that year.

Section 1.1373–1(a)(2), Income Tax Regs., provides in part:

A donee or purchaser of stock in the corporation is not considered a shareholder unless such stock is acquired in a bona fide transaction and the donee or purchaser is the real owner of such stock. The circumstances, not only as of the time of the purported transfer but also during the periods preceding and following it, will be taken into consideration in determining the bona fides of the transfer. * * *

Under such section, we must give careful consideration to all the circumstances surrounding the purported stock transfer to Rummonds on May 26, 1971. California law also provides that to determine the effective date of a transfer of corporate stock, all the surrounding facts and circumstances must be examined. Cal. Com. Code. sec. 8309 (West 1964); *Orpheum Bldg. Co. v. Anglim*, 127 F.2d 478, 481 (9th Cir. 1942); *Robbins v. Pacific Eastern Corp.*, 8 Cal. 2d 241, 65 P.2d 42, 59 (1937).

As a first matter, the assignment separate from certificate which the petitioner executed to Rummonds on May 26 states plainly: "This Assignment to be effective July 1, 1971. Dated 5–26–71." Furthermore, stock certificate number two, which

transferred the stock of Meloland from the petitioner to Rummonds, was dated July 1, 1971. This Court has held that:

Where a taxpayer has entered into a written agreement * * * that provides for the specific terms of a transaction the tax consequences of which are in issue, we have applied the rule that "strong proof" must be adduced by the taxpayer if he seeks to establish a position at variance with the language of the agreement to which he was a party. * * * [*Lucas v. Commissioner*, 58 T.C. 1022, 1032 (1972).]

We find that the petitioner has failed to present sufficient evidence, much less the "strong proof" required under the holding of the *Lucas* case, to establish that the effective date of the stock transfer to Rummonds was not July 1, 1971, the effective date of the transfer set forth on all the relevant documents.

The petitioner argues that the assignment separate from certificate which he executed on May 26, 1971, had the effect of transferring title to the Meloland stock to UCB at such time since UCB already held the certificate to such stock. However, Mr. Mann, who was the sole shareholder of Rummonds, who was the attorney for UCB handling the transfer of the stock, and who considers himself an expert in the area, testified that the May 26 agreement by which the petitioner "sold, assigned and transferred" his stock in Meloland to Rummonds was nothing more than a binding commitment by the petitioner to transfer such stock and that such was his intention when he drew up the agreement. Moreover, the testimony of the principals of such transaction indicates that the bank and Rummonds considered the effective date for the transfer to be July 1, 1971. Mr. Mann stated unequivocally that the effective date for such transfer was July 1, 1971. Mr. Gregg, the vice president at UCB who worked with the petitioner's account, also testified that the effective date was July 1, 1971. Furthermore, the accountants' report for Meloland examining the balance sheet of such corporation as of June 30, 1971, states that its subchapter S status "automatically terminated *on July 1, 1971* when the stock of the Company was transferred to a corporate stockholder." (Emphasis added.) Finally, the petitioner's failure to transfer the corporate books and records until July or August of that year suggests that he did not consider the transfer to have taken effect in May of that year.

We are not persuaded by the petitioner's contention that the

bank's reconveyance of the deed to his residence on June 29, 1971, is evidence that the stock transfer took place on May 26. The record in this case is replete with evidence that the petitioner cooperated with the bank's liquidation of his collateral at every possible opportunity and that the bank was responsive to and appreciative of such cooperation. The onion shed property was not sold until September 1971, but the petitioner's residence was reconveyed to him substantially prior to such sale. In the light of the obvious cooperation between the petitioner and UCB, it is not at all surprising that UCB reconveyed the title to his residence to him shortly before the effective date of the transfer of the stock when it was assured that the liquidation of his collateral was nearly completed.

The petitioner's reliance on *Pacific Coast Music Jobbers, Inc. v. Commissioner*, 55 T.C. 866 (1971), affd. 457 F.2d 1165 (5th Cir. 1972), is misplaced. In *Pacific Coast*, this Court held that a sale of stock had taken place in the year in which the sale agreements had been executed despite the fact that such shares were placed with an escrow agent. The Court rejected the taxpayer's contention that a sale had not taken place until 5 years later when the stock was released from escrow, and it held that the sellers used such escrow account merely as a security device to guarantee future payment and that a completed sale of the stock had taken place in the year in which the agreement was made. The Court considered numerous circumstances to conclude that the taxpayer had acquired all the "accouterments of ownership" (55 T.C. at 877) on the sales date, and that the taxpayer obtained "domination and control" (55 T.C. at 877) over the corporation despite the fact that the shares were held in escrow. The Court in *Pacific Coast* was not confronted with the situation presented in this case where there is an unambiguous document containing the effective date of the stock transfer. Accordingly, we hold that the petitioner was the sole shareholder of Meloland on June 30, 1971, the last day of the taxable year of such corporation. Therefore, he must include in gross income the undistributed taxable income of Meloland under section 1373.

The last issue for consideration is whether any part of the underpayment of taxes for the year in issue was due to fraud with intent to evade tax within the meaning of section 6653(b), which provides in part:

(b) FRAUD.—If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *

The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for the year was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; *Levinson v. United States*, 496 F.2d 651 (3d Cir. 1974), cert. denied 419 U.S. 1040 (1974); *Estate of Pittard v. Commissioner*, 69 T.C. 391 (1977); *Estate of Temple v. Commissioner*, 67 T.C. 143 (1976); *Imburgia v. Commissioner*, 22 T.C. 1002 (1954); *Petit v. Commissioner*, 10 T.C. 1253 (1948). To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes, which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); *Webb v. Commissioner*, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; *Acker v. Commissioner*, 26 T.C. 107, 112–113 (1956).

The Commissioner's sole contention with respect to fraud is that the petitioner failed to report the gain on the sale of the six lots with the deliberate intent to evade taxes. He claims that the petitioner is an intelligent and experienced businessman familiar with real estate procedures and that he has demonstrated his business acumen through the numerous business ventures in which he is involved. The Commissioner maintains that the petitioner was aware of the correct reporting activity with respect to the disposition of property as is evidenced by his reporting the sale of the farm equipment to CFE in October 1970 on his 1970 income tax return. The Commissioner concludes that the petitioner's failure to report a similar occurrence 1 year later is a deliberate intent to evade tax. We must disagree with the Commissioner.

The primary distinction between the sale of the six lots and the sale of the farm equipment is that the bank had filed a notice of foreclosure with respect to the lots approximately 3 months before their sale to the newspaper. It is not unreasonable to conclude that the petitioner thought that he no longer owned the property once such notice was filed. Indeed, even the petitioner's accountant, Mr. Campbell, testified that he thought the bank took over everything in foreclosure proceedings. In any event,

given the complexity of the facts and issues in this case, we can accept the contention that a person, not an expert in tax law, may not have understood the tax consequences of the transfer of the six lots. *Arnold v. Commissioner*, 14 B.T.A. 954, 971–972 (1928) (fraud penalty not imposed where facts were complicated and correct tax liability was difficult to ascertain). Accordingly, we find that the Commissioner has failed in his burden of establishing fraud from the petitioner's failure to report the gain on the sale of the six lots.

In conclusion, we hold: (1) That the petitioners realized a long-term capital gain on the sale of the six lots to the newspaper and that such gain is recognizable pursuant to section 1002, subject to the provisions of section 1201 et seq., relating to capital gains and losses; (2) that they realized a long-term capital loss on the sale of the onion shed property to CFE and that such loss is recognizable pursuant to section 1002, subject to the provisions of section 1201 et seq., relating to capital gains and losses; (3) that they realized a long-term capital gain on the disposition of the Meloland stock and that such gain is recognizable pursuant to section 1002, subject to the provisions of section 1201 et seq., relating to capital gains and losses; (4) that they did not realize any income resulting from the partial discharge of their indebtedness by UCB since they were insolvent at such time; (5) that Mr. Danenberg was the sole shareholder of Meloland on June 30, 1971, and must include such corporation's undistributed taxable income in his gross income for the year in issue pursuant to section 1373; and (6) that no part of the underpayment of tax for the year in issue was due to fraud.

*Decision will be entered under Rule 155.*