Gants, Ralph D., J.
This case arises out of differences of interpretation of a settlement agreement entered into between the plaintiff Peter Massmanian (“Massmanian”) and the defendants William DuBose, Blaine DuBose, and what the agreement describes as the DuBose Entities, which are various corporations controlled by William and Blaine DuBose. For all practical purposes, there are three disputes that have prevented this case from reaching closure, which this Court will address in turn.
1. The Form 1099 Provided by the DuBose Entities to Massmanian
The first dispute arises from paragraph 2(a) of the Settlement Agreement, in which the DuBose Entities agreed to pay $700,000 to the law firm that represented Massmanian in the underlying settled litigation. Part of that provision declares:
The DuBose Entities will not, on their own initiative, issue a 1099 or W-2 for the $700,000 unless they are required to issue one by the Internal Revenue Service. To the extent permitted by law, the parties intend to treat the $700,000 payment as not being income to Massmanian.
Settlement Agreement at 12(a). The DuBose Entities, in fact, issued Massmanian a Form 1099 in the amount of $700,000, after their accountant determined they were required to do so. Massmanian contends that the issuance of this 1099 violated Section 2(a) because the DuBose Entities had not obtained a private letter ruling (or the functional equivalent) from the Internal Revenue Service (“IRS”) declaring that they were required to issue a 1099. Massmanian argues that the inclusion of the phrase, “on their own initiative,” in conjunction with the use of the word, “required,” means that the DuBose Entities had agreed not to issue the 1099 until and unless the IRS had required them to do so. The DuBose Entities respond that the determination of whether the IRS requires the issuance of the 1099 need not await a private letter ruling specific to this case if they have determined, based on the Internal Revenue Code and the applicable regulations, case law, and IRS guidance, that the IRS requires its issuance.
In interpreting this provision, which affects how the parties will fulfill their obligation to report income to the IRS, this Court is guided not only by the clear language of the Agreement and the intent of the parties, but also by public policy considerations. The language of paragraph 2(a) plainly provides that the DuBose Entities may not issue a 1099 for the amount paid to Massmanian’s attorneys if the DuBose Entities do not believe that the issuance of the form is required by the IRS. The language is ambiguous, however, as to what prerequisites must be satisfied before the DuBose Entities may determine that they “are required to issue [a 1099] by the [IRS].” Id. at §2(a). When the language of a contract reasonably permits two alternative interpretations, that ambiguity generally means that summary judgment is denied and that parol evidence may be admitted to resolve the ambiguity in light of the intent of the parties. However, when one of the two alternatives is contrary to public policy and is unenforceable, then the Court may select the alternative interpretation that would not run afoul of public policy. See Goldfarb v. Marchionne, 12 Mass.App.Ct. 933, 934 (1981) (rescript) (declining to enforce a contract that contained a term “deliberately designed to mislead the taxing authorities”). See also Cruz v. State Farm Mut. Auto. Ins. Co., 466 Mich. 588, 599 (2002) (contracting parties are assumed to intend that their agreements are valid and enforceable; accordingly, the court interprets contracts that are po *600 tentially void as against public policy to harmonize with public policy where reasonably possible).
Here, this Court is greatly concerned about the public policy implications of agreements among parties as to whether or how to report income to tax authorities when subsequently one of the parties learns that the agreed-upon course of action is likely to be found illegal under the governing tax law. Parties cannot agree to engage in illegal conduct. Nor should an agreement be enforced that may cause a party to proceed with a course of action that he believes to be illegal. Nor should an agreement be enforced that requires a party to seek a private tax ruling on a matter that is already addressed by tax statutes, regulations, or controlling case law. Therefore, this Court finds, as a matter of public policy, that Section 2(a) may not be interpreted to require a party not to issue a 1099 when:
1. That parly has been advised by his attorney or accountant that the failure to issue a 1099 would be illegal under the governing federal tax law; and
2. This Court, from its own independent examination of that federal tax law, determines that it is more likely than not that the advice proffered by the parly’s attorney or accountant is correct.
Under the first prong of this two-pronged standard, the DuBose Entities could not have filed a 1099 unless they received professional advice from their attorney or accountant that they were required to do so by governing IRS law; the record is undisputed that they received such advice. Under the second prong, this Court will independently examine that advice based on its own examination of federal tax law to determine whether, more likely than not, it is correct. This independent inquiry avoids the risk that a party will simply search for an attorney or accountant who will provide the advice the client wishes. The preponderance standard is chosen to avoid the need for this Court to make a definitive finding of law regarding a matter of federal tax law. Such definitive findings by a state court are discouraged unless absolutely necessary to resolve a case because they pose a risk of confusing federal tax law with interpretations that are not reviewable by any federal court except the United States Supreme Court. See generally Mazzola v. Myers, 363 Mass. 625, 633-34 (1973).
This Court has conducted such an independent examination of federal tax law regarding the issuance of a 1099 regarding monies paid to a plaintiffs attorney as part of a settlement. Based on that examination, not only is it more likely than not that the DuBose Entities’ accountant was correct in his advice, it is nearly certain that the advice was a correct statement of federal tax law. As a general proposition, the Supreme Court has held that “when a litigant’s recovery constitutes income, the litigant’s income includes the portion of the recovery paid to the attorney as a contingent fee.” Commissioner v. Banks, 543 U.S. 426, 430 (2005). Since, in one of the two cases before the Court in Banks, the defendant had paid the attorneys fees directly to the plaintiffs counsel, as occurred here under the Settlement Agreement, the holding in Banks plainly is not limited to those circumstances where the plaintiff pays his attorneys fees from the settlement proceeds. Id. at 431-32. In addition, IRS regulations clearly state that the plaintiff must pay income taxes on the money paid to his attorney, regardless of whether the fees are paid out of the proceeds of the settlement or by the defendant to the plaintiffs counsel directly. Treas. Reg. §1.6041(f)(2), Example 2. Moreover, IRS regulations clearly require the DuBose Entities to issue a 1099 regarding its payment to Massmanian’s attorneys. See 26 C.F.R. §1.6045-5(f), Example 3 (defendant must file two “information returns” when it issues separate checks to plaintiff and plaintiffs attorney — one to the plaintiff in the combined amount of both checks and one to the attorney in the amount paid directly to her).
Under these circumstances, it would be contrary to public policy to enforce any contractual provision that would require the DuBose Entities to seek a private letter ruling before issuing a 1099. Not only would such a contractual obligation impose a needless burden on the IRS, but it would also be futile because a private letter ruling could not trump existing IRS regulations. See Gibson Wine Co. v. Synder, 194 F.2d 239 (C.A.D.C. 1952).
Therefore, this Court finds as a matter of law that the DuBose Entities, having been correctly advised by their accountant that they were required to file a 1099 for the amount paid to Massmanian’s attorneys, did not breach the Settlement Agreement by failing first to obtain a private letter ruling from the IRS.
2. The Back-Dating of the Redemption Date
Under paragraph 2(c) of the Settlement Agreement, the DuBose Entities agreed to pay $780,600.87 to Massmanian via his lawyers for redemption of his shares of North/Win as of October 1, 2005, plus $19,399.13 for the interest accrued between October 1, 2005, and May 23, 2006, the date of closing on the settlement. Settlement Agreement at 112(c). The second dispute arises from paragraph 12 of the Settlement Agreement, which specifically provided that the parties intended Massmanian to have no share of the income, gains, or losses of the DuBose Entities for the fiscal year ending September 30, 2006, which is the fiscal year that commenced on October 1, 2005. Settlement Agreement at 1112. The Settlement Agreement specifically recognized that the IRS may not permit them to back-date the redemption date to the beginning of the fiscal year, since the Settlement Agreement was entered into on May 1, 2006 and closed on May 23, 2006. Under the Agreement, the DuBose Entities agreed to indemnify Massmanian for any additional tax liabilities “[i]n the event that the Internal Revenue Service does not allow the parties to treat the redemption date as October 1, 2005.” Id.
*601 Based upon conversations with an IRS agent, an IRS supervisor, and a tax attorney, Massmanian came to believe that it would violate the tax laws to treat the redemption as having occurred retroactively as of October 1, 2005. He, therefore, has demanded a Form K-1 that reflected his percentage of ownership in the DuBose Entities for part of the fiscal year ending September 30, 2006. The Dubose Entities argue that, regardless of this belief, Massmanian is obliged by the Settlement Agreement to proceed in accordance with the terms of the Settlement Agreement until the IRS has formally disallowed the October 1, 2005 redemption date. Therefore, the DuBose Entities have refused to provide Massmanian with a Form K-l for the fiscal year ending September 30, 2006, because it contends that under the Agreement he no longer had any ownership interest during that fiscal year.
This dispute poses a somewhat different issue than the first. The DuBose Entities had a net loss in fiscal year 2006, so the real issue is who will enjoy the tax benefits arising from these losses. The DuBose Entities cannot provide two sets of Form K- Is — one reflecting its understanding as to who owned the Entities in fiscal year 2006 and a second reflecting Massmanian’s understanding — since this would mean that more than 100 percent of the Entities’ net losses would be reported on the DuBose and Massmanian tax returns. Pragmatically, without the Form K-l, Massmanian would not be able to report these losses on his tax returns and would therefore have a greater tax liability. This would hardly put him at risk with the IRS, since he would be paying more in taxes than he contends is due. Since he agreed in the Settlement Agreement that he would have no share of the losses of the DuBose Entities for the fiscal year ending September 30, 2006, and since this position does not mean here that he will be under-reporting income or underpaying his income taxes, he cannot compel the DuBose Entities to provide him with a Form K-l that disregards the retroactive redemption date.
If anyone will be at risk with the IRS by proceeding in accordance with the Settlement Agreement, it will be the DuBose Entities and the DuBoses themselves, the former for issuing arguably erroneous K-ls and the latter for arguably under-reporting their net income by overstating their share of the losses in the DuBose Entities. While this is a closer issue than the first, there is certainly Tax Court case law supporting the principle that retroactive dates may not be used for tax purposes when the actual event occurred at a later date. See Danenberg v. Comm’r, 73 T.C. 370 (1979); Wiese v. Comm’r, 35 T.C. Memo 1641, fn. 11 (1976). Cf. Moore v. Comm’r, T.C. Memo 2007-134, p. 15-16 (where parties had begun effective transfer prior to agreement, agreement did not constitute impermissible backdating). To be sure, based on the Court’s reasoning in resolving the first dispute, the DuBose Entities will not be acting in breach of the Agreement if they determine, based on the reasoned advice of their accountant or attorney, that the Form K-ls cannot reflect the back-dated redemption date. However, in contrast with the first dispute, the DuBose Entities contend that the tax advice they have received endorses the use of the contractually agreed-upon date. This Court will not, need not, and should not rule on whether back-dating the redemption date will pass muster under the Internal Revenue Code. See Kirchick v. Guerry, 429 Mass. 215 (1999) (declining to resolve federal tax law issue when “there are no State interests or duties that would be affected by our ruling”). The DuBose Entities and the DuBoses may act in accordance with their understanding of federal tax law, which happens to comport with the terms of the Settlement Agreement, but they do so at their peril.
Similarly, based on the reasoning resolving the first dispute, this Court will not interpret the Settlement Agreement to bar Massmanian from seeking a ruling from the IRS on this issue or from providing the IRS with a copy of the Settlement Agreement and other information that it may need to determine whether to allow the parties to treat the redemption date as October 1, 2005. Any interpretation of the Agreement that would prohibit a party from providing the IRS with the information it would need to make an informed decision regarding the allowance of the retroactive redemption date would be void as contrary to public policy.
In short, as to this second dispute, the DuBose Entities may issue the Form K-ls that they consider comport with the applicable law. Massmanian may seek a ruling from the IRS on this issue or otherwise provide the IRS with the relevant information it would need to evaluate the appropriateness of the retroactive redemption date. Under the Settlement Agreement, if the IRS ultimately disallows the retroactive redemption date, then the DuBose Entities shall indemnify Massmanian for the additional taxes he paid to the IRS as a result of losing the benefit of his share of the net losses for fiscal year 2006.
3. The Issuance of a 1099-MISC for the Forgiven Loan
The third dispute involves the DuBose Entities’ issuance of a 1099-MISC to Massmanian for $118,499.97 reflecting income he allegedly received based on the forgiveness of a loan.
According to Massmanian, the actual amount of the loan was $35,796, the balance remaining on a $42,000 loan he received from South/Win (one of the DuBose Entities) in 2001. In 2003, Massmanian observed that an entry in the accounts receivable for North/Win (another DuBose Entity) listed the amount of the loan as $60,000, and that two months later the amount was increased to $85,000. Massmanian attests that, when he questioned Will DuBose about this line item, DuBose told him that carrying this loan on the books of North/Win helped North/Win because it *602 increased the amount of money North/Win could borrow from the bank. DuBose promised that the debt would be written off at the end of North/Win’s 2003 fiscal year.
In the winter of 2003, according to Massmanian, he received a document from North/Win’s outside accountant asked him to acknowledge that he owed $85,000 to North/Win. He refused, because he contended it was not true. Will DuBose repeatedly asked him to sign the document, stating that it was just a formality and promising that he would never need to pay the amount or any taxes on that amount. Massmanian persisted in his refusal.
On January 19, 2004 Will DuBose agreed in writing that the notes receivable from Massmanian on the books of North/Win in the amount of $89,870.26 and $10,015.38 shall be written-off at some future date and, when written-off, Massmanian shall recognize income and North/Win shall recognize an expense. On April 22, 2004, Ted Humphrey, North/Win’s Chief Financial Officer, wrote a memorandum to the DuB-oses and Massmanian memorializing North/Win’s commitment to pay the taxes due on the forgiven loan, which he estimated to be roughly $11,842. However, when the Settlement Agreement was executed in May 2006, these notes receivable had not been written-off by North/Win and remained on its books. On February 2, 2007, months after the Settlement Agreement had been executed, North/Win issued a Form 1099-MISC in the amount of $118,499.97, which the DuBose Entities contend is the amount of the forgiven loan. The DuBose Entities did not pay Massmanian anything for the additional tax liability that he will owe on this additional reported income.
As to this dispute, Massmanian has brought three claims. First, he contends that the amount of the loan is overstated roughly threefold in amount and in error as to its source, since he owed only $35,796 to South/Win and borrowed nothing from North/Win. Second, he contends that the DuBoses and the DuB-ose Entities breached their oral promise to pay the income taxes due on this forgiven loan, memorialized in the April 2004 Humphrey memorandum. Third, he contends that the defendants made intentional misrepresentations regarding their intention to reimburse him for any income taxes due on the forgiven loan, which he relied upon to his detriment.
This Court finds that each of these claims were released in the General Release, which was executed as part of the Settlement Agreement. Under that broad General Release, each parly to the Agreement released the other from “all manner of actions, causes of action, suits, debts, accounts, . . . covenants, contracts, agreements, judgments, claims and demands whatsoever, in law, ... or in equity, whether known or unknown .. .” Under the General Release, the DuBose Entities forgave the Massmanian loan, because they released all “debts” owed to them by him. Any contract entered into by the DuBoses or the DuBose Entities to pay the taxes due on the forgiven loan was also released, since all prior “contracts” and “agreements” were released by Massmanian. Characterizing the contractual promise as a representation on which Massmanian relied to his detriment cannot salvage it from the Release, because Massmanian also released all “causes of action” and “claims” “whatsoever.” In short, with the Settlement Agreement, the parties declared peace and released all prior obligations and claims that any parly had against the other, including any obligation to pay the income taxes on the forgiven loan. Massmanian was well aware of the forgiven loan when he negotiated the Settlement Agreement and needed specifically to have addressed the issues arising from this loan as part of the settlement in order to protect his claims from the General Release.
Massmanian contends that this misrepresentation is not covered by the release signed by the parties because the harm was caused intentionally or by gross negligence. See Restatement (Second) of Contracts §195 (1981) (“A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy”). If the Release had concerned future conduct by the DuBose Entities, Massmanian’s argument may prevail, since public policy would not permit someone to release another from intentional tortious conduct that may be committed in the future. However, the alleged misrepresentation here was made in 2004, well before the Settlement Agreement had been executed, and public policy does not bar a claimant from releasing another from claims arising from past intentional misconduct. Any rule to the contrary would defeat the purpose of general releases — to effect the release of all claims of whatever nature arising out of any transactions between the parties, even if the issues were not in the minds of the parties at the time the release was executed. See Eck v. Godbout, 444 Mass. 724, 728-30 (2005).
Nor is this Court persuaded by Massmanian’s argument that he could not know at the time of the Settlement Agreement that the defendants would renege on their commitment to pay the income taxes on his forgiven loan. By releasing them from all contractual commitments as part of the General Release, he surrendered any legal right he may have had to enforce that contractual promise.
ORDER
For the reasons stated above, having resolved the disputed issues of interpretation regarding the Settlement Agreement, the defendants’ motion for summaiy judgment is ALLOWED. Judgment shall issue for the defendants, with statutory costs only.