DANNY CHIN AND JANNY CHIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chin v. Commissioner
Docket No. 10638-88
United States Tax Court
T.C. Memo 1991-70; 1991 Tax Ct. Memo LEXIS 103; 61 T.C.M. (CCH) 1957; T.C.M. (RIA) 91070; February 26, 1991, Filed *103 Decision will be entered under Rule 155. James C. Griggs, for the petitioners. Shirley M. Francis, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax for petitioners' 1978 through 1984 taxable years, as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
Sec. 6661
1978
$ 10,473
$  5,237
---  1979
23,979
11,990
---  1980
45,348
22,674
---  1981
37,821
18,911
---  1982
26,827
13,414
$ 5,636
1983
3,523
1,762
---  1984
2,184
1,092
---  *104 The following issues remain for our consideration: (1) Whether petitioners had unreported income from their restaurant business for each of the taxable years under consideration; (2) if petitioners had unreported income, whether any part of the underpayment in tax was attributable to fraud; (3) whether petitioners had a substantial understatement of income tax for their 1982 taxable year; and (4) whether the period for assessment had expired with respect to the 1978, 1979, 1980, and 1981 taxable years. FINDINGS OF FACT The parties entered into a stipulation of facts, along with attached exhibits, all of which are incorporated by this reference. Petitioners had their legal residence in Dallas, Oregon, at the time their petition was filed in this case. Petitioner, Danny Chin (the use of "petitioner" in the singular shall refer to Danny Chin) was born during 1936 in China. His parents, Charley Chin and Ng Sau Kin (Madame Ng), were also born in China. Petitioner's parents were 17 and 15 years old when they were married in accord with a traditional arrangement by a marriage broker. About 3 years after their marriage, the father immigrated to the United States of America, never *105 returning to China. Charley Chin and Madame Ng since that time have merely maintained a friendly relationship. Madame Ng and petitioner fled China for Hong Kong, during the fall of 1949, just prior to the Communist revolution. Once in Hong Kong, Madame Ng began a second marital relationship which produced two children, a boy and a girl. Madame Ng resided in Hong Kong until 1972, when she, at about the age of 55, immigrated to the United States of America. Her port of entry was San Francisco, California, and she has remained a resident alien. With the exception of a brief period during 1974 when she resided with petitioners, Madame Ng has resided in San Diego, California. Petitioner left Hong Kong during 1951, at the age of 15, and immigrated to the United States of America to live with Charley Chin and his wife (Lucille Chin) in Roseburg, Oregon. Charley and Lucille Chin operated a restaurant in Tillamook, Oregon, from 1960 to 1985. The operation of the restaurant did not provide a sufficient source for Charley Chin to make a large cash gift to petitioner during the 1970's. Sometime during the 1950's petitioner entered into his first marriage which ended in divorce about *106 2 years later and from which two children issued. Thereafter, petitioner lived with a woman he did not marry. During 1971, petitioner Janny Chin immigrated from Hong Kong to the United States of America and married petitioner. Petitioners have four children. Petitioner's father (Charley Chin) died during 1986. After Charley Chin had left China, his parents (petitioner's grandparents) died and left their property to petitioner. The property was held by Madame Ng on petitioner's behalf until petitioner became an adult. The property generally consisted of real and personal property, including business property. During 1949, Madame Ng sold the property for a depressed price of $ 35,000 because of the impending Communist takeover. When Madame Ng arrived in Hong Kong she entrusted the $ 35,000 proceeds to a friend who managed and invested the funds until the friend's death sometime during the 1960's. From the time she arrived in Hong Kong, Madame Ng worked as a clothing contract laborer to support herself and her son. Thereafter, she began another family and had two additional children. When Madame Ng came to the United States of America in 1972 she brought the appreciated fund, *107 composed of $ 137,000 in U.S. currency, in a money belt around her waist. She did not declare the currency to the U.S. Customs Service because she had been told not to do so. Shortly thereafter, probably during 1972, Madame Ng presented petitioner with his inheritance. Petitioners have not disclosed the existence of a cash hoard or inheritance on any loan application documents. After Madame Ng arrived in the United States of America she received financial assistance from petitioner and her other two children. Thereafter, she began receiving public assistance, including welfare payments, and her children ceased supporting her. Beginning in about 1966, petitioner engaged in the restaurant business with his father's brother, Winston Chin. Sometime in 1967, Winston Chin purchased petitioner's share of their restaurant business, and then petitioner worked for his father and stepmother until 1973. On October 15, 1970, petitioner declared voluntary bankruptcy and was granted a discharge on January 26, 1971. Petitioner did not list his potential inheritance as an asset of his bankruptcy estate. He declared $ 42,576.71 in debts and assets totaling $ 227.70. Petitioners opened the *108 Hong Kong Restaurant (the restaurant) in Dallas, Oregon, in 1974 and operated it throughout the years in issue. In 1979 petitioners purchased improved real property for $ 175,000 in Salem, Oregon. In 1984 petitioners purchased unimproved realty in Salem, Oregon, for $ 137,000. During March 1985, petitioner purchased improved realty in Tillamook, Oregon, for $ 57,000 (including a $ 17,000 down payment). In 1975, 1979, 1981, 1984, and 1985 petitioners purchased residential realty which was used as rental property, with the exception of one, which was used as their residence. During 1983, petitioners made cash mortgage payments totaling $ 12,888 on the " $ 175,000 property" purchased during 1979. During May 1985, respondent's agent began an audit of petitioners' tax returns. Initially, petitioner provided financial documents (unaudited) to the agent. Petitioners' "bookkeeping method" was to check the cash register tape daily to satisfy himself that employees had accounted for all sales. Petitioner would then record amounts on a cash sheet and destroy or discard the cash register tapes. With the exception of the cash register tapes, petitioners' books were otherwise complete. *109 Although petitioner contracted with bookkeepers, the bookkeepers were not provided access to the cash register tapes and hence had no means to verify the correctness of the sales or receipts. The agent performed a source and applications of funds analysis for 1982 through 1984, which resulted in unaccounted for applications. When asked to explain the differences, petitioner advised the agent that his mother had brought $ 130,000 into the country. Subsequently, petitioner provided a source and application of funds for the years 1978 through 1981. Respondent's agent agreed with petitioner's version, with the exception that petitioner had not included his cost of goods sold in the amount of $ 201,582 for 1981. Thereafter, respondent's agent proposed unaccounted for sources for the taxable years 1978 through 1981 and petitioner, for the first time, alleged a cash hoard of $ 307,000. Part of the "cash hoard" was allegedly due to a gift from petitioner's father in the amount of $ 177,000 during 1975. Charley Chin did not leave anything to any of his six children, including petitioner, in his will. Petitioners do not contest the accuracy of respondent's source and application of *110 funds computation. They contend that the difference in the computation is not attributable to business income, but to petitioners' cash hoard. During the audit, petitioner attempted to show the source of the funds from his mother by means of a 1986 letter allegedly from petitioner's mother's friend who held and invested petitioner's inheritance. The letter was offered as contemporaneous even though the friend in question had died about 20 years before. Also, on various occasions where petitioner met with respondent's agents the amounts and/or the application of the inheritance or alleged cash hoard varied. During the taxable year 1984, petitioners reported a loss from the operation of the restaurant, but made "cash" purchases totaling $ 86,165, as follows: Bar system
$ 13,488
Cash registers
2,000
Arcade machines
4,390
Microwave oven
209
Show case
226
Space heater
693
Rental property improvements
8,233
Down pymt., lot-Salem, Oregon
33,000
Escrow deposit
5,000
Down pymt. residence
6,153
Refrigerator
919
Cable television stock
2,500
Cadillac automobile
9,354
Total Cash Expenditures - 1984
$ 86,165
Petitioners *111 expanded their restaurant in 1979, and $ 230,000 was borrowed through the U.S. Small Business Administration. Their application for the loan reflected $ 30,000 in cash at the end of 1978. Although petitioner claimed to have a cash hoard, petitioners maintained a business checking account. Petitioners also maintained a savings account with the Citizens Savings & Loan Association of Medford, Oregon, which had a balance of $ 101,339.91 as of January 27, 1983. Petitioners also maintained a safe-deposit box which was entered on a fairly regular basis by petitioner. Following the commencement of the audit by respondent, petitioner's gross receipts in the next return of income increased substantially. Petitioners offered John E. Cornyn, who was accepted as an expert on food service management. Mr. Cornyn's opinion was offered to show that petitioners reported all of the receipts from their restaurant business during the year in issue. Mr. Cornyn's report and analysis reflected that petitioners' cost of goods sold was within the range of averages for restaurants in the western part of the United States for the period in question. On cross-examination respondent brought out that Mr. *112 Cornyn had no actual knowledge of petitioners' business statistical data and that his opinion was wholly dependent upon figures supplied by petitioners. It was also shown that petitioners' cost of goods sold for the years in question was statistically at the high end of the averages. It was also shown that adding the differences in respondent's source and application computation (which respondent determined to be income) to petitioners' reported income would lower the cost of goods sold ratio to an amount which was still within the average for restaurants in the western part of the United States. At the time of the audit and subsequent trial of this case petitioner had been in this country for more than 30 years. He had a reasonably good command of the English language. Government auditors, employees of petitioners, and people with whom petitioners dealt observed that petitioners had no particular difficulty communicating in English. Petitioners' failure to report income for the years under consideration was due to fraud. OPINION We consider here circumstances where petitioners agree that respondent's source and application of funds method of reconstructing petitioners' income *113 does reflect an excess of applications. The parties disagree as to whether any part of the difference is unreported income from the operation of petitioners' restaurant or whether it was sourced in petitioner's cash hoard. If we decide that any part of the difference resulted in an underpayment of tax, we must also decide whether that underpayment was due to fraud. The question of fraud is also important here because it will be determinative of whether the period for assessment remained open for certain of the earlier years before the Court. The Burden of Proof - Petitioner argues that respondent bears both the burden of proving fraud and the burden of showing that there is a deficiency in income tax. Petitioner argues that respondent acquired the burden with respect to the income tax deficiency because he used an indirect method to reconstruct petitioners' income. Petitioner contends that respondent must prove that the restaurant business produced or was capable of producing income in the amounts determined in the notice of deficiency. Respondent argues that he was justified in using an indirect method and that he has shown linkage to a source of unreported income, the *114 restaurant business. Respondent agrees that he has the burden of proving fraud. See sec. 7454(a); Rule 142(b). Additionally, because the normal 3-year period for assessment would have expired for the taxable years 1978, 1979, 1980, and 1981, respondent has the burden of showing that an assessment may be made. Respondent relies upon section 6501(c)(1), which provides that the tax may be assessed at any time in the case of a false or fraudulent return with the intent to evade tax. Accordingly, if we find that petitioners were fraudulent within the meaning of section 6653(b) for any of the taxable years 1978 through 1981, any assessment would be "timely." It is well established that respondent may utilize indirect methods of reconstructing taxpayer's income. Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954). Respondent is entitled to use a reconstruction method in several circumstances, including where a taxpayer has no books and records, or inadequate books and records. Holland v. United States, supra; Adamson v. Commissioner, 745 F.2d 541 (9th Cir. 1984). In the setting of this case petitioners maintained professionally *115 and independently derived books of account. The only exception or flaw in their bookkeeping system concerned the destruction of the daily sales tapes from their cash register. This admitted and intentional omission may be sufficient to justify respondent's use of an indirect method of reconstructing income. Petitioners have not offered (and we are at a loss to imagine) any reasonable explanation for the destruction of the source material from which their reported income could be verified. Additionally, petitioners have been shown to extensively deal in cash. Finally, petitioners' expert report relies upon statistical information which supports the argument that petitioners' receipts could have been understated. This was shown by adding the amounts of unreported income determined by respondent to the amounts reported by petitioners. After adding these amounts, petitioners' cost of goods sold percentages (or gross profit percentages) continued to fall within the parameters of a range of averages for restaurants in the western United States. It is also hard to accept petitioners' position on this issue because they have conceded by stipulation that respondent's source and application *116 computations are correct, leaving us the task of deciding whether the source of the difference was from income or cash hoards in the form of alleged gifts from family members. Accordingly, respondent has shown an obvious source of additional revenue and petitioner retains the ultimate burden of showing that respondent has erred with respect to the income tax deficiencies. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Unreported Income vs. Cash Hoard - Petitioners have conceded that respondent's source and application of funds analysis results in applications of funds in excess of sources of funds for each taxable year, as follows: Taxable Year
Excess Applications
1978
$  27,431
1979
43,460
1980
67,682
1981
49,861
1982
49,621
1983
28,931
1984
50,922
Total
$ 317,908
Petitioners argue, however, that the entire amount is attributable to nontaxable sources, more specifically $ 137,000 from an inheritance and $ 177,000 from a parental gift. Respondent does not contend that petitioner did not receive an inheritance, but argues that the amount is overstated, and that in any event, the inheritance was consumed prior to the *117 taxable years under consideration. With respect to the $ 177,000 alleged gift from petitioner's father, respondent argues that the evidence in the record refutes the possibility of such a gift. Initially, it is most interesting and seemingly fortuitous that petitioners' alleged nontaxable sources approximate the excess applications which respondent has determined were income for the specific years in issue. It is most telling that petitioner disclosed a $ 130,000 inheritance after respondent confronted him with about $ 129,474 in excess applications for 1982 through 1984. When respondent computed and disclosed additional excess applications for 1978 through 1981, petitioner again, and most conveniently, disclosed yet another large nontaxable source ($ 177,000) which, when considered along with the $ 130,000, would almost cover the amount of the deficiency determinable by respondent. Although we have found that respondent has shown that petitioner's father was not financially capable of making a $ 177,000 gift to petitioner, the $ 130,000 inheritance has been established in this record. There is some confusion about the exact amount (sometimes shown as $ 130,000 and other times *118 as $ 137,000) and the specific date that petitioner received his inheritance, but we can safely proceed with the premise that petitioner had access to $ 130,000 in cash at some time during 1972, after his mother arrived from Hong Kong. The question we must decide is whether petitioner(s) had dissipated that inheritance prior to 1978, the first taxable year in issue. From 1966 until 1973 petitioner had been in the restaurant business with his father's brother, Winston Chin, for a few years until he was bought out, and then he worked for his father and stepmother until 1973. On October 15, 1970, petitioner declared bankruptcy and he was granted a discharge on January 26, 1971. Petitioner did not list his potential inheritance as an asset of his bankruptcy estate. He declared $ 42,576.71 in debts and assets totaling $ 227.70. Petitioners opened the Hong Kong Restaurant in Dallas, Oregon, in 1974 and operated it throughout the years in issue. This factual pattern strongly suggests that petitioner would have used at least some part of his inheritance to start up his own restaurant business prior to 1978. Petitioner has not shown the source of capitalization for his restaurant business *119 beginning in 1974. On the other hand, based upon respondent's determination, petitioners were already operating profitably during 1978, and presumably did not suddenly experience that level of business beginning in 1978. It is more likely that petitioners used some portion of the $ 130,000 inheritance to capitalize the restaurant in 1974, and that future expenditures may have come from a combination of business profits and the remainder of the inheritance. Although we are unable to decide with specificity the amount petitioner needed to start up his restaurant business, certain evidence in the record provides sufficient assistance to determine a reasonable approximation of that amount. During 1984 petitioners' cash expenditure in respondent's source and application analysis reflects about $ 22,000 out of $ 86,165 in total application that was expended on restaurant items, as follows: Bar system
$ 13,488
Cash registers
2,000
Arcade machines
4,390
Microwave oven
209
Show case
226
Space heater
693
Refrigerator
919
Total
$ 21,925
Based upon respondent's application of funds for the 7 years under consideration, it appears that similar purchases were made *120 in most years at issue. Accordingly, with the exception of the year where funds were borrowed for major renovations, petitioners have been outfitting their restaurant in a piecemeal fashion over a period of years. Based upon that observation, we hold that petitioners injected one-eleventh of the $ 130,000, or $ 11,818 for each of the years 1974 through and including 1984. Cohan v. Commissioner39 F.2d 540 (2d Cir. 1930). Accordingly, petitioners had used $ 47,272 as of the end of 1977, and $ 11,818 was used in each of the taxable years in issue, which should reduce respondent's applications to correspondingly reduce the overall amount of unreported income. We do not find respondent's determination of unreported income to be in error in any other regard. Addition to Tax For Fraud, Section 6653(b) - The issue of fraud is factual and is usually determined based upon the entire record. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). That burden may not be carried by a taxpayer's failure to carry the burden concerning the underlying *121 deficiency. Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Direct evidence of fraud is not always available and we may draw reasonable inferences from the record as a whole. Grosshandler v. Commissioner, supra.Ultimately, we must decide whether petitioner(s) intended to evade tax which he knew or believed to be owing. Danenberg v. Commissioner, 73 T.C. 370, 393 (1979). In this case respondent argues that fraud exists in each year because it was established by evidence showing: (1) A pattern of 7 years of substantial understatements of income; (2) petitioners' alleged destruction of all source documents reflecting the gross receipts from their business; (3) numerous false and misleading statements made to respondent throughout the course of this case; (4) an excessive or unusual use of cash to make payments not reflected in an otherwise well-organized, meticulous set of books and records; (5) expenditures that are inconsistent with the business losses reported on petitioners' tax returns; and (6) a dramatic turnaround in the profitability of petitioners' business after respondent's audit [was commenced]. *122 Petitioners' counterargument to these points is essentially that they did not have any unreported income and the differences are attributable to their cash hoard. Further, petitioners argue that discrepancies regarding what was reported to respondent at various times, or in the bankruptcy petition, or other such circumstances was due to petitioners' English language impediment. Petitioners also argue that a safe-deposit box was maintained by them to store a cash hoard composed of gifts from relatives. Petitioners' account of a cash hoard has changed and varied in a way that defies credulity. Further, one could just as easily argue that petitioner's entry into a safe-deposit box was to store the cash hoard being accumulated from the operation of the restaurant business. Petitioner has shown no credible direct evidence of the contents of the box or pattern of entry which would support his contentions. We reject petitioners' contentions and find that a part of the underpayment of tax in each of the taxable years 1978, 1979, 1980, 1981, 1982, 1983, and 1984 was due to fraud. Key to our finding is the destruction of the only source documents (cash register tapes) from which actual *123 receipts could be verified coupled with petitioners' otherwise complete set of books and records. We are also persuaded by the extensive use of cash and the consistent understatement for 7 consecutive years. Of less importance, but still probative, is petitioner's changing story regarding his cash hoard as respondent "raised the ante." Due to our finding of fraud with respect to all taxable years in controversy, the issue concerning the expiration of the period for assessment is obviated under the provisions of section 6501(c)(1). Finally, respondent determined that petitioner was liable for an addition to tax for a substantial understatement for the taxable year 1982 under section 6661. That section provides for a 25-percent addition to tax which is attributable to a substantial understatement of income tax. Section 6661(b)(1)(A) defines a "substantial understatement" as one which exceeds the greater of 10 percent of the tax required to be shown or $ 5,000. Petitioner has not shown any reason for deciding that the addition is not applicable. Accordingly, the addition to tax under section 6661 is applicable for petitioners' 1982 taxable year. To reflect the foregoing, *124 Decision will be entered under Rule 155.
Footnotes
1. Section references are to the Internal Revenue Code of 1954 as amended and in effect for the years before the Court. Rule references are to this Court's Rules of Practice and Procedure. For the taxable years 1982, 1983, and 1984, the sec. 6653(b)(1) addition has been determined by respondent. Additionally, for those 3 years respondent determined that sec. 6653(b)(2) is applicable and to be computed based upon $ 22,545, $ 3,523, and $ 2,130 for the taxable years 1982, 1983, and 1984, respectively.↩