T.C. Memo. 2001-73


UNITED STATES TAX COURT


ROGELIO R. BALOT and ZENAIDA V. BALOT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19077-98.                    Filed March 23, 2001.


        Ps worked as blackjack and roulette dealers, and P-H
worked as a "pit boss", at a casino in Prince George's
County, Maryland.  The casino recorded on daily time sheets
the number of hours Ps worked.  Also, the casino gathered,
apportioned, and periodically paid to the dealers and pit
bosses the tips from the patrons.  R determined deficiencies
based on the casino's time sheets and other records, and Ps'
bank deposits.

        1.  <u>Held</u>:  Ps are liable for additions to tax for civil
fraud for 1991 and 1992.  See sec. 6663, I.R.C. 1986.

        2.  <u>Held</u>, <u>further</u>, Ps are liable for an addition to tax
for negligence for 1993.  See sec. 6662(a), I.R.C. 1986.

        3.  <u>Held</u>, <u>further</u>, amounts of deficiencies
redetermined.

Benson S. Goldstein, for petitioners.

Judith C. Cohen, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge:  Respondent determined deficiencies in individual income tax and additions to tax under sections 6663[1] (fraud) and 6662(a) (negligence) against petitioners as follows:

| Year | Deficiency | Additions to Tax | |
| | | Sec. 6662(a) | Sec. 6663 |
| --- | --- | --- | --- |
| 1991 | $3,910 | -- | $2,933 |
| 1992 | 7,686 | -- | 5,765 |
| 1993 | 2,968 | $594 | -- |

---

[1]Unless indicated otherwise, all part and section references are to parts and sections of the Internal Revenue Code of 1986 as in effect for the years in issue.

After concessions by respondent[2], the issues for decision are as follows:

(1) Whether petitioners are liable for civil fraud additions to tax under section 6663 for 1991 and 1992.

(2) Whether petitioners are liable for a negligence addition to tax under section 6662(a) for 1993.

(3) What is the amount of petitioners' unreported income for 1991 through 1993.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

---

[2]In the answer, respondent conceded that the proper amounts of petitioners' 1993 deficiency and addition to tax are not more than $2,800 and $560, respectively. However, on opening brief, respondent asks us to conclude that petitioners are liable for a 1993 negligence addition to tax "in the amount of $594". We regard respondent's statement on brief as a clerical error and not an attempt to withdraw part of the concession.

Also, at five places in paragraph 7 of the answer, respondent stated that at least a part of petitioners' 1993 underpayment is due to fraud. In the prayer for relief, respondent asked: "That the additions to tax for the years 1991 through 1993 under the provisions of I.R.C. § 6663, as set forth in the notice of deficiency, be in all respects approved." In the prayer for relief, respondent did not refer to the section 6662(a) addition to tax for negligence. On brief, respondent deals with fraud for only 1991 and 1992, and deals with negligence for 1993. We conclude that (1) Respondent did not intend to assert the fraud addition to tax for 1993, and (2) respondent did not intend to concede the negligence addition to tax for 1993, except to the extent indicated in the first paragraph of this footnote.

Petitioners Rogelio R. Balot (hereinafter sometimes referred to as Rogelio) and Zenaida V. Balot (hereinafter sometimes referred to as Zenaida) filed joint tax returns for the years in issue, but have since divorced. Petitioners resided at separate addresses in Fort Washington, Maryland, when they filed their joint petition.

A.  Rogelio's Background

From 1967 to April 1989, Rogelio served in the United States Navy as a logistician; that is, a person who is responsible for logistics. Logisticians attend to the details of acquiring equipment and other supplies, making sure that these supplies meet specifications, and making sure that these supplies are sent to the right place at the right time. During the last 3 years of his military service, Rogelio was the enlisted supervisor of about 25 people who dealt with logistics for the Presidential helicopter in Quantico, Virginia. Rogelio received pension distributions from the Navy in each of the years in issue.

In 1989, shortly after retiring from the Navy, Rogelio obtained full-time employment as a logistician with Validity Corporation, a defense contractor that deals with the Government. Rogelio attended to the requisitioning of supplies for the Validity Corporation, a task similar to his Navy duties. He did not have any supervisory responsibilities in this Validity Corporation position. Validity Corporation compensated Rogelio

on a biweekly basis using the direct deposit method of payment during the years in issue.

Although Rogelio does not hold a college degree, he did complete 3 years of college course work.  Rogelio also completed several courses in business management, accounting, and business law at the University of Maryland and Prince George's Community College.

B.  Zenaida's Background

During the years in issue, Zenaida was employed full-time as a branch manager for First American Bank.  In this position, Zenaida was (1) in charge of branch sales, (2) in charge of branch operations, and (3) responsible for keeping branch expenditures within budget determinations that were made at higher levels.  She supervised 9 to 10 employees, including bank tellers and personnel in charge of establishing new accounts with the bank.  First American Bank entrusted Zenaida with responsibilities such as ordering supplies in accord with the branch's operating budget, ensuring the branch had sufficient cash on hand to transact business for the day, and ensuring the automated teller machines contained sufficient cash for the operation thereof.  At the time of the trial, Zenaida was a branch manager for Crestar Bank.

Zenaida earned a Bachelor of Science Degree in Elementary Education from the University of the Philippines in or about

1967. Before beginning her career in the banking industry, Zenaida worked as a schoolteacher.

C.  The CIPAA Casino

The Combined International Philippines America Association (hereinafter sometimes referred to as CIPAA) was organized sometime in the 1970's. CIPAA operated a casino (hereinafter sometimes referred to as the CIPAA Casino) in Prince George's County, Maryland, during the years in issue. Proceeds from the CIPAA Casino were to aid in the construction and operation of a Philippine cultural center to be located in the Washington, D.C., metropolitan area.

The CIPAA Casino employed dealers and pit bosses to operate the tables at the casino premises. Dealers accepted bets and received or paid out chips as required by the results of the bets; they dealt cards, spun wheels, and otherwise interacted directly with the bettors. Pit bosses supervised dealers. During the years in issue there generally were about 70 to 80 dealers, and one pit boss for each 6 to 8 dealers.

The CIPAA Casino recorded on daily time sheets the number of hours each employee worked. Employees generally signed their names and recorded the times at which they arrived at the casino premises for work, on the time sheet kept for that particular day, although pit bosses occasionally recorded the time one or another employee came to work. If an employee left the casino

premises before closing time, then that employee recorded the time at which he or she left. If an employee worked until closing time, then a pit boss entered the time the CIPAA Casino closed as the time the employee's shift ended. The CIPAA Casino's Tuesday sessions closed at 11:00 p.m.; the Saturday sessions closed at 2:00 a.m. Sunday morning.

The CIPAA Casino paid its employees an hourly amount for their services even though the CIPAA Casino management and staff, including dealers, understood that Maryland gaming laws expressly prohibited the practice. During the years in issue, pit bosses and dealers earned compensation of $12 and $10 per hour, respectively. The CIPAA Casino paid this compensation to its employees in cash on a weekly basis. Beginning about July of 1993, the CIPAA Casino began to pay its employees by check instead of cash.

CIPAA Casino employees did not complete Forms W-4, and the CIPAA Casino did not withhold Social Security taxes or income taxes, in 1991 and 1992 from any of the compensation it paid to its employees. The CIPAA Casino recorded the amount of compensation its employees received in 1991 and 1992 on individual affidavits executed by each employee. The CIPAA Casino issued Forms W-2 to its employees for the first time for 1993.

To create the appearance of compliance with Maryland law, the CIPAA Casino's management and staff, including dealers, (1) characterized all remuneration they received from the CIPAA Casino as tips, the receipt of which was believed to be legal, and (2) referred to themselves as volunteers rather than employees. The CIPAA Casino's management told the staff that amounts received from the CIPAA Casino were not to be reported to the Internal Revenue Service as wages.

CIPAA Casino employees also received tip income through the CIPAA Casino. On each gaming table at the casino premises were two boxes: One for cash that bettors exchanged for chips at the table, and one for chips and cash that the bettors gave to the dealers as tips. The latter box is sometimes hereinafter referred to as a tip box. Each hour a "runner" collected both boxes. The moneys in the tip boxes were then commingled and distributed to the pit bosses and dealers in proportion to their hourly compensation; i.e., hourly rate times amount of time worked. The CIPAA Casino distributed tip income about every 3 weeks.

Some pit bosses and dealers also received tips directly from casino patrons. These tips were not placed into the table's tip box and were not divided in the manner described above. Rather, the recipient of the tip simply kept it for personal use. The

record does not show that either petitioner received any such direct tips.

D.   Petitioners' Involvement With the CIPAA Casino

Rogelio and Zenaida became members of CIPAA to help with the cultural center project.  In 1991, Rogelio and Zenaida applied for and obtained positions with the CIPAA Casino; each of them worked for the CIPAA Casino during each of the years in issue.  After receiving extensive training from the CIPAA Casino's management, Rogelio became a low-stakes blackjack dealer; Zenaida became a roulette dealer.  Rogelio began working for the CIPAA Casino on or about March 30, 1991; Zenaida began on or about November 23, 1991.  Rogelio and Zenaida maintained their full-time positions with Validity Corporation and First American Bank, respectively, in addition to the positions they held at the CIPAA Casino.

Each petitioner worked for the CIPAA Casino most Saturdays and most Tuesdays.  For 1991 and 1992, each petitioner typically worked for the CIPAA Casino 14 hours on Saturdays.  Rogelio typically worked for the CIPAA Casino 11 hours on Tuesdays; Zenaida typically 6 hours on Tuesdays.  (The record does not include time sheets or equivalent information for 1993.)

Rogelio became a pit boss at some point.  (See infra note 3).  Rogelio became treasurer of the CIPAA Casino in 1994.

Zenaida became a pit boss at some point and an assistant to the president of the CIPAA Casino at a later point.

### 1. Hourly Compensation

Rogelio worked 882.5 hours at the casino premises in 1991, for which the CIPAA Casino paid $8,825 of hourly compensation to him. Zenaida worked 105.5 hours at the casino premises in 1991, for which the CIPAA Casino paid $1,055 of hourly compensation to her. Petitioners did not report any of their CIPAA Casino hourly compensation on their 1991 tax return.

Rogelio worked 947.5 hours in 1992, for which the CIPAA Casino paid hourly compensation to him.[3] Zenaida worked 654.75 hours in 1992, for which the CIPAA Casino paid $6,548 (rounded) of hourly compensation to her. Petitioners did not report any of their CIPAA Casino hourly compensation on their 1992 tax return.

The CIPAA Casino paid $8,110.75 of compensation income to Rogelio for 1993. The CIPAA Casino paid $5,781.79 of

---

[3]On opening brief, respondent asks us to find that Rogelio was a dealer in 1992, "and in 1993 casino management promoted him to pit boss." On the same page of this brief, respondent asks us to find that Rogelio was paid "$12 an hour as a pit boss in 1992." Petitioners do not object to either proposed finding. The parties agree that the CIPAA Casino compensated Rogelio at the rate of $10 per hour when he was a dealer and $12 per hour when he was a pit boss. Because each party is on both sides of the question as to when Rogelio was shifted from $10 per hour to $12 per hour, the parties are directed to resolve this matter in the computation under Rule 155.

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

compensation income to Zenaida for 1993. The CIPAA Casino issued Forms W-2 to Rogelio and Zenaida for this 1993 compensation income, which petitioners reported on their 1993 tax return.[4]

### 2. Tip Income

Each petitioner received a share of the tips that bettors left at the tables in the casino premises during each of the years in issue. On their 1992 tax return, petitioners reported that Rogelio received $750 tip income and Zenaida received $480 tip income. Petitioners' 1991 and 1993 tax returns do not include any income that is stated to be tip income. Petitioners did not report any income from the CIPAA Casino on their 1991 tax return. The income from the CIPAA Casino that petitioners reported on their 1993 tax return is shown on Forms W-2, but is not described as including tip income, on either the Forms W-2 or petitioners' tax return.

---

[4]The four Forms W-2 attached to petitioners' 1993 tax return show "Wages, tips, other compensation" amounts aggregating $71,146.57. On their tax return, petitioners show $71,237. The difference is accounted for by (1) rounding and (2) petitioners' reporting Zenaida's CIPAA Casino income as $5,872, instead of $5,781.79, as shown on the Form W-2. This roughly $90 overreporting is to be corrected in the computation under Rule 155, to the extent it has not already been indirectly taken into account in respondent's notice of deficiency determination of "Other Unreported Income".

3.  Check Cashing

In addition to her other income-producing activities, Zenaida cashed checks for a $5 fee.  She performed this service about two or three times during the years in issue.

E.  Bank Deposits

Petitioners maintained five bank accounts in four separate institutions during the years in issue.

Table 1 shows petitioners' aggregate deposits into each account, by account number, in each year in issue.

Table 1

| Account | 1991 | 1992 | 1993 |
|---|---|---|---|
| 5-852-706 | $57,905.90 | $47,971.13 | $56,679.69 |
| 26-320-93-3 | 1,449.09 | 13,029.36 | -0- |
| 612-2552-9 | 3,305.32 | 44,415.40 | 32,065.10 |
| 0215714-007 | 9,600.00 | 9,600.00 | 9,660.66 |
| 75-009-232 | 11,829.51 | 29,142.89 | 21,639.44 |
| Total Deposits | 84,089.82 | 144,158.78 | 120,044.89 |

Table 2 shows respondent's analysis of petitioners' bank account deposits for each of the years 1991 through 1994.  Except as indicated otherwise in the notes to table 2, the "Excess deposits per Appeals" in the table became the notice of deficiency adjustments labeled "Other Unreported Income".

Table 2

BANK ACCOUNT ANALYSIS

|                                   | 9112        | 9212          | 9312        | 9412        |
|-----------------------------------|-------------|---------------|-------------|-------------|
| Total Bank Account Deposits       | 84,090.     | [3]144,149.   | 120,045.    | 139,307.    |
| less non-taxable deposits         | (9,066.)    | (37,457.)     | (22,219.)   | (45,958.)   |
| Income-wages-Net[1]               | (44,149.)   | (46,922.)[6]  | (54,638.)   | (75,164.)   |
| -Retirement T/P-H                 | (15,094.)   | (15,177.)     | (17,756.)   | (23,246.)   |
| -Retirement T/P-W                 | (3,157.)    |               |             |             |
| -IRA Distribution                 | (224.)      |               |             |             |
| -Condo Rent                       | (8,200.)    | (5,895.)      | (4,500.)    | (6,950.)    |
| -Miscellaneous                    | (147.)      | (675.)        | (368.)      | (668.)      |
| -Tips                             |             | (1,230.)      |             |             |
| -Sale of Stock-Net                |             | (5,978.)      | (2,969.)    |             |
| Excess Deposits per Exam          | 4,053.      | [4]30,823.    | 17,595.     | (12,679.)   |
| Additional Non-Taxable Income Per Appeals Adjustments | -0- | (3,396.) | (7,576.) |          |
| Excess deposits per Appeals       | [2]4,053.   | [5]10,629.    | [7]10,018.  | -0-         |

[1]  "Net" means net of withheld amounts shown on the Forms W-2.

[2]  This amount is $19 less than the 1991 $4,072 notice of deficiency adjustment for Other Unreported Income.  In the absence of an explanation from respondent, we conclude that the slight preponderance of the evidence of record leans toward petitioners with respect to this $19.  On opening brief, respondent concedes a $21 amount, which may include this $19.  The parties are directed to resolve this matter in the computation under Rule 155.

[3]  This amount is $10 less than the sum of the stipulated amounts deposited into petitioners' bank accounts.  Compare supra table 1, column 1992.  Respondent attributes the difference to a clerical error on respondent's part, and "concedes the $10 difference."  That is, respondent does not ask that the 1992 $10,630 notice of deficiency adjustment for Other Unreported Income be increased to correct this error.

[4]  This amount is $8 more than the sum of the items in the 1992 column showing the bank account analysis that respondent made in determining the amount of the 1992 $10,630 notice of deficiency adjustment for Other Unreported Income.  In the absence of an explanation from respondent, we conclude that the slight preponderance of the evidence of record leans toward petitioners with respect to this $8.

[5]  In arriving at the 1992 Other Unreported Income adjustment in the notice of deficiency, respondent subtracted the

$16,798 adjustment for Unreported Income--Casino. Respondent did not make a corresponding subtraction of the 1991 $9,880 adjustment for Unreported Income--Casino in arriving at the 1991 Other Unreported Income. Neither side has sought to explain, justify, or attack this substantial difference between the 1991 and 1992 procedures. We leave the parties as we find them on this matter. See, e.g., Thomas v. Commissioner, 92 T.C. 206, 232 (1989), and cases there cited.

[6] This amount includes the $90 by which petitioners overstated their Forms W-2 income on their 1993 tax return. See infra table 3, note 2.

[7] This amount is $600 less than the amount of the 1993 $10,618 notice of deficiency adjustment for Other Unreported Income. On brief, respondent asks us to find that the correct amount of this adjustment is $10,010, which is $608 less than the notice of deficiency adjustment. It may be that this discrepancy is what led to respondent's concession (see supra note 2) in the answer that the deficiency is $168 less than the amount determined in the notice of deficiency, and that the negligence addition to tax is $34 less than the amount determined in the notice of deficiency. Also, there is a $1 difference between the $10,018 "excess deposits" and the sum of the amounts in the 1993 column; we assume that this difference arises from rounding the amounts to the nearest dollar. The parties are directed to resolve this matter in the computation under Rule 155.

F. Tax Returns

On their tax returns for the years in issue, petitioners reported income and total tax as shown in table 3.

Table 3

| Item | 1991 | 1992 | 1993 |
| --- | --- | --- | --- |
| l.7--Wages, etc. (Form W-2) | $57,945 | [1]$62,339 | [2]$71,237 |
| l.8--Interest | 129 | 675 | 218 |
| l.9--Dividends | 18 | -- | 9 |
| l.10--Taxable refunds | -- | -- | 136 |
| l.13--Capital gain or (loss) | -- | (3,000) | [3]14 |
| l.17--Pensions and annuities | 16,413 | 16,576 | 17,281 |
| l.18--Rents, etc. | (5,081) | (3,899) | (6,122) |
| l.23--Total income | 69,424 | 72,691 | 82,773 |
| l.53--Total tax | 7,333 | 7,362 | 9,224 |

[1] The $62,339 total includes petitioners' Form W-2 income from First American Bank and Validity Corporation, and petitioners' "Unreported Tip Income" from the CIPAA Casino (Rogelio--$750; Zenaida--$480).

[2] Comparison of a schedule attached to petitioners' 1993 tax return and the Forms W-2 attached to the same return makes it clear that a transposition of two digits from Zenaida's CIPAA Casino Form W-2 to the schedule resulted in petitioners overstating their income by $90. See supra note 4.

[3] Petitioners' 1992 tax return shows a $19,000 capital loss carryover from 1992 to 1993, stemming primarily from a $21,688 "Loss in value" on 12,000 shares of PanAm Stock acquired on November 26, 1990. It does not appear that petitioners claimed any capital loss carryover on their 1993 tax return.

Petitioners timely filed their tax returns for each of the years in issue: 1991--mid-April 1992, 1992--mid-August 1993, and 1993--mid-April 1994.

Petitioners' 1991 and 1992 tax returns were prepared by W.O. Monroyo & Associates. Petitioners' 1993 tax return was prepared by Automated Tax & Financial Services.

_____

Petitioners failed to report on their tax returns the hourly compensation that the CIPAA Casino paid to each of them in 1991 and 1992. Petitioners failed to report on their tax return the tip income that the CIPAA Casino gathered, apportioned, and periodically paid to petitioners in 1991. The failures to report this income resulted in underpayments of tax required to be shown on petitioners' tax returns for 1991 and 1992. The failures to

report this income, and the resulting underpayments for 1991 and 1992, were due to the fraud of each petitioner for each year.

For 1993, petitioners had an underpayment of tax required to be shown on their tax return, and some part of this underpayment was due to petitioners' negligence.

OPINION

I.  General Summary

The CIPAA Casino paid $10 or $12 per hour worked to each petitioner in 1991, 1992, and 1993.  As to this hourly compensation, the CIPAA Casino did not send Forms W-2 to petitioners for 1991 and 1992, but did for 1993.  Petitioners did not report any of this income on their 1991 (almost $10,000) and 1992 (about $15,000) tax returns; they reported the full W-2 amounts on their 1993 tax return.

The CIPAA Casino gathered, apportioned, and periodically paid to their employees the tips that patrons paid.  Petitioners did not report any of this tip income on their 1991 tax return; they reported $1,230 of this income (Rogelio--$750, Zenaida--$480) on their 1992 tax return.

We hold that respondent proved, by clear and convincing evidence, that (1) petitioners failed to report hourly compensation that they received in 1991 and 1992, (2) petitioners failed to report tip income that they received in 1991, (3) these omissions led to underpayments of tax for 1991 and 1992, and (4)

each of these underpayments was due to the fraud of both Rogelio and Zenaida.

We hold that petitioners failed to prove, by a preponderance of the evidence, that (1) any part of the underpayments for 1991 and 1992 was not due to fraud, (2) any of the deficiency determinations for 1991, 1992, or 1993 in the notice of deficiency was excessive, and (3) any part of the 1993 underpayment was not due to petitioners' negligence.

We consider first 1991 and 1992, the years as to which respondent determined fraud.  We then consider 1993.

## II.  1991-1992

Respondent contends (1) that petitioners underpaid their taxes for 1991 and 1992, and (2) that all of petitioners' 1991 and 1992 underpayments are due to fraud and thus, petitioners are liable for the fraud additions to tax under section 6663.

Petitioners contend (1) that they did not underpay their taxes for 1991 and 1992, and (2) that respondent has not met respondent's burden of proof on the fraud issue.  Petitioners maintain (A) that respondent's use of the bank deposits method of income reconstruction was not appropriate, and (B) that even if use of the bank deposits method was appropriate, petitioners' excess deposits are attributable to nontaxable sources. Alternatively, petitioners contend that if they have underpaid their taxes, then any additions to tax are not appropriate

because (1) petitioners did not act with the requisite fraudulent intent, and (2) reasonable cause supported their actions.

We agree with respondent's conclusions and most of respondent's contentions.

When respondent seeks to impose the addition to tax under section 6663[5], respondent has the burden of proof.  To carry this burden for a year, respondent must prove two elements, as follows:  (1) That petitioners have an underpayment of tax for that year, and (2) that some part of that underpayment is due to fraud.  See sec. 7454(a)[6]; Rule 142(b); see, e.g., <u>Carter v.</u>

---

[5]SEC. 6663.    IMPOSITION OF FRAUD PENALTY.

(a)  Imposition of Penalty.--If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

(b)  Determination of Portion Attributable to Fraud.-- If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.

(c)  Special Rule for Joint Returns.--In the case of a joint return, this section shall not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse.

[6]SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION
         MANAGER, AND TRANSFEREE CASES.

(a)  Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent
(continued...)

Campbell, 264 F.2d 930, 936 (5th Cir. 1959); Stone v. Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).[7]  Each of these elements must be proven by clear and convincing evidence.  See DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 663-664 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud.  See, e.g., Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274.  In carrying this burden, respondent may not rely on petitioners' failure to meet their burden of proving error in respondent's determinations as to the deficiencies.  See, e.g., Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982), and cases cited therein.

---

[6](...continued)
to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.

[7]The elements of fraud under sec. 6663 are essentially the same as those we considered under sec. 6653(b) of prior law.  See also Rhone-Poulenc Surfactants v. Commissioner, 114 T.C. 533, 547-548 (2000); Clayton v. Commissioner, 102 T.C. 632, 652-653 (1994); Houser v. Commissioner, 96 T.C. 184, 185 n.1 (1991).

Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. See Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958); McLaughlin v. Commissioner, 29 B.T.A. 247, 249 (1933). A mere understatement of income does not establish fraud. However, a pattern of consistent underreporting of income for a number of years is strong evidence of fraud. See Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memos. 1970-144 and 1970-37; Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100; Otsuki v. Commissioner, 53 T.C. at 108.

The issue of fraud is a factual question that is to be decided on an examination of all the evidence in the record. See Plunkett v. Commissioner, 465 F.2d at 303; Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224.

In order to establish fraud as to a taxpayer, respondent must show that that taxpayer intended to evade taxes which that taxpayer knew or believed were owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See, e.g., Grossman v. Commissioner, 182 F.3d 275, 277 (4th Cir. 1999), affg. T.C. Memo. 1996-452; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Danenberg v. Commissioner, 73 T.C. 370,

393 (1979); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). This intent may be inferred from circumstantial evidence. See Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), including the implausibility of petitioners' explanations. See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986) (and cases cited therein), affg. T.C. Memo. 1984-601; Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951. Fraud is not imputed from one spouse to another; in the case of a joint tax return, respondent must prove fraud as to each spouse charged with liability for the addition to tax. See sec. 6663(c); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner, 56 T.C. at 227-228.

A. Underpayment

### 1. The CIPAA Casino--Hourly Compensation

Time sheets were maintained by the CIPAA Casino for dealers and others who worked at the casino during each of the years before the Court. The CIPAA Casino paid compensation of $10 per hour to dealers and $12 per hour to pit bosses during these years.

Each petitioner worked at the casino in 1991 and in 1992 and received, as compensation for his or her services, weekly

payments from the CIPAA Casino, calculated at the appropriate hourly rate.

Petitioners did not report any of this income on the joint tax returns that they filed for 1991 and 1992. Petitioners do not claim for either year that this unreported income is properly offset by any deductions, etc., in addition to what is shown on their tax returns.[8]

Accordingly, petitioners' failures to report this hourly compensation on their 1991 and 1992 joint tax returns result in an underpayment of tax required to be shown on their 1991 tax return and an underpayment of tax required to be shown on their 1992 tax return. We have so found.

Petitioners agree that both of them worked for the CIPAA Casino during each of the years before the Court. They also agree, or at least do not dispute, that the CIPAA Casino paid to each of them weekly $10 or $12 per hour for each hour petitioners

---

[8]Respondent need not prove that petitioners did not have offsetting deductions. Once the Commissioner has presented clear and convincing evidence of unreported gross receipts, the taxpayer has the burden of coming forward with evidence as to offsetting deductions claimed by the taxpayer, even in criminal cases where the Government must prove a deficiency beyond a reasonable doubt. See, e.g., United States v. Hiett, 581 F.2d 1199, 1202 (5th Cir. 1978); United States v. Campbell, 351 F.2d 336, 338-339 (2d Cir. 1965); Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956); see also DiLeo v. Commissioner, 96 T.C. 858, 872 (1991); Reiff v. Commissioner, 77 T.C. 1169, 1175 (1981). This rule is independent of the general rule applicable to civil cases, in which the taxpayer has the burden of proving entitlement to deductions before they may be allowed. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

worked in the casino.  Petitioners' only contentions with regard to this hourly "remuneration" (petitioners' term) are that (1) it was not "wages", and (2) "The management of the CIPAA casino inflated the number of hours worked by casino employees during the years 1991-1993."

Firstly, none of this hourly compensation was reported on petitioners' tax returns for 1991 and 1992.[9]  As a result, petitioners' allegation that the management of the CIPAA Casino inflated the number of hours worked by casino employees does not affect our conclusion that petitioners' failures to report any of their hourly compensation result in underpayments of tax for both 1991 and 1992.

Secondly, the CIPAA Casino time sheets appear to conform to the testimony of each petitioner, both as to the procedures that were followed and also as to each petitioner's pattern of arrivals at and departures from the casino.  The variety of handwritings confirms the testimony that often the entries for

---

[9]Petitioners reported on their 1992 tax return $750 tip income for Rogelio and $480 tip income for Zenaida.  The parties stipulated that "Petitioners typically worked on Saturdays and at least one day during the week."  If these tips were the hourly compensation (as petitioners seem to suggest), and if petitioners were paid $10 or more per hour (as petitioners concede), then this would mean that Rogelio worked for an average of less than 1 hour each day he showed up, and Zenaida worked for about ½ hour each day she showed up.  The absurdity of this conclusion convinces us that petitioners do not seriously contend that their 1992 tip reporting was intended to be a reporting of the hourly compensation that each petitioner received from the CIPAA Casino.

any individual were made by that individual. Rogelio testified that his usual Saturday shift was 14 hours--from noon to 2 a.m. the next morning, confirming the information on the time sheets. Zenaida testified to her usual 14-hour Saturday shift. As to Tuesdays, Rogelio's confusing testimony appears to confirm the general 11-hour shift shown by the time sheets; Zenaida clearly testified that her Tuesday shift was generally around 6 hours. As a result, we are satisfied that the CIPAA Casino time sheets are accurate as to the number of hours each petitioner worked at the casino in 1991 and 1992.

Thirdly, as petitioners implicitly conceded by reporting tips as income on their 1992 tax return, tips are income subject to tax. See, e.g., Olk v. United States, 536 F.2d 876, 879 (9th Cir. 1976). So that "he that runs may read", line 7 of the Form 1040 for each of the years before the Court states "Wages, salaries, tips, etc." (Emphasis added.) Whatever label petitioners would rather we apply to the hourly compensation that the CIPAA Casino paid to each petitioner in 1991 and 1992, those payments are income subject to tax. See, e.g., section 61(a)(1).

We hold, for respondent, that respondent has proven by clear and convincing evidence that petitioners failed to report the hourly compensation paid to them by the CIPAA Casino in 1991 and 1992, in the amounts determined in the notice of deficiency as "Unreported Income-Casino", except to the extent that

respondent's brief introduces an uncertainty as to the amount of Rogelio's 1992 hourly compensation.  See supra note 3.

## 2. The CIPAA Casino--Tip Income

The record is clear that each petitioner also received each year an appropriate portion of the tips that the casino's patrons left in 1991 and 1992.[10]  Petitioners did not report any tip income on their 1991 tax return.  Petitioners reported 1992 tip income of $750 for Rogelio and $480 for Zenaida.  Apart from petitioners' thus-reported 1992 tip income, we do not find anything in the record that would enable us to quantify petitioners' tip income for 1991 or 1992.

Petitioners urge, in both opening brief and answering brief, that our opinion in Executive Network Club, Inc. v. Commissioner, T.C. Memo. 1995-21, "highlights the extent to which the IRS' case

---

[10]On opening brief, respondent asserts that, in addition to the tips that the CIPAA Casino gathered from patrons and distributed to the dealers, etc., "Moreover, in each year, petitioners received cash tips directly from patrons. (Tr. pp. 191-193)."  We have found, supra, that "The record does not show that either petitioner received any such direct tips."  The transcript pages that respondent cites refer to the testimony of another person who worked for the CIPAA Casino during at least part of the period in issue in the instant case.  That person testified that she had received such direct tips.  Respondent's counsel asked:  "Okay.  Did other employees earn tips in this manner as well?"  The witness replied:  "Probably, I don't know." Later, petitioners' counsel asked that witness:  "Did you ever see someone on the see [side ?] pay Mr. Balot or Mrs. Balot?" The witness replied:  "I don't recall, sir, because it was done secretly."  Thus the only evidence to which respondent directs our attention, or that our examination has turned up, is a disclaimer of knowledge.  Respondent's assertion on this point is unfounded on the record in the instant case.

regarding the Petitioners is distorted." Our findings of fact in Executive Network Club, Inc. describe some of the operations of a charitable organization's casino operation in Prince George's County, with a focus on how tips from patrons were collected by the casino and "were ultimately distributed to the workers in cash." We held that the casino operation constituted an unrelated trade or business. However, we held that the tips that came from the patrons and were distributed to the casino workers did not constitute income to the exempt organization. In the course of our opinion, we noted as follows:

> [4] The fact that the tips were shared does not preclude a finding that the payments by the patrons were tips. Similar pooling or tip-splitting arrangements have been held to constitute tip income to those participating in the pooling or tip-splitting arrangement. See Allen v. United States, 976 F.2d 975, 976 (5th Cir. 1992); Olk v. United States, 536 F.2d 876, 877 (9th Cir. 1976); Catalano v. Commissioner, 81 T.C. 8, 11-13 (1983), affd. without published opinion sub nom. Knoll v. Commissioner, 735 F.2d 1370 (9th Cir. 1984); Armeno v. United States, 6 Cl. Ct. 521 (1984). In respondent's regulations, respondent describes such pooling arrangements. Secs. 31.3121(a)-1(c), 31.6053-3(j)(12)-(13), and 31.6053-4(a)(2), Employment Tax Regs.; see also Guadron v. Commissioner, T.C. Memo. 1994-553; Tech. Adv. Mem. 81-46-001 (Sept. 21, 1978) [Executive Network Club, Inc. v. Commissioner, T.C. Memo 1995-21.]

We agree with petitioners (as does respondent) that the process of gathering tips, apportioning them, and periodically paying them out to the workers in Executive Network Club, Inc. is quite similar to the process followed by the CIPAA Casino during the years in issue in the instant case.

However--

(1) As we note in <u>Executive Network Club, Inc</u>. such tips are income to those workers who ultimately receive the money, but in the instant case petitioners did not report any of this tip income on their 1991 tax return.

(2) Such tips are separate from the hourly compensation that each petitioner received in each year; the hourly compensation also is income; and petitioners did not report any of this hourly compensation on their 1991 and 1992 tax returns.

Thus our opinion in <u>Executive Network Club, Inc. v. Commissioner</u>, <u>supra</u>, does not support any of petitioners' relevant contentions, but rather is consistent with, and supports, respondent's position in the instant case.

We hold that respondent has proven by clear and convincing evidence that each petitioner received taxable tip income in 1991 and 1992, and that petitioners failed to report their 1991 tip incomes. However, we also hold that respondent failed to prove, by even a preponderance of the evidence, (a) the amount of either petitioner's unreported 1991 tip income and (b) whether petitioners failed to report any 1992 tip income.[11]

---

[11]On opening brief, respondent asserts that "these tips clearly accounted for a large part, if not virtually all, of the 'other unreported income.'" Respondent has not favored us with citations to evidence of record that would support this assertion

(continued...)

B. Fraudulent Intent

Each day that either petitioner worked in the casino, that petitioner earned $10 (or $12) per hour for the time worked. Each week, the CIPAA Casino paid to each petitioner (and to their coworkers at the casino) the hourly compensation. These hourly compensation amounts paid to petitioners totaled almost $10,000 in 1991 and around $15,000 in 1992. Petitioners failed to report any part of this hourly compensation on their 1991 and 1992 tax returns. They also failed to report any of their 1991 tip income. The foregoing omitted income amounts to about 15 percent in comparison to the total income they reported on their 1991 tax return, and about 20 percent for 1992. See supra table 3. Based on the record as a whole, including our observations of each petitioner at trial (both testified) and our evaluation of their educational backgrounds and the sort of full-time jobs each of them had during 1991 and 1992, we conclude that each petitioner knew that this hourly compensation and tip income were subject to tax and that their failures to report any part of this income on either of their tax returns for 1991 and 1992 were due to fraud. Thus the underpayments resulting from these failures to report were due to fraud. We have so found.

---

[11](...continued)
or any quantification of petitioners' tip income.

Petitioners' own testimony confirms their having received this hourly compensation and tip income. Petitioners have not explained their total failure to report these amounts. Petitioners' explanations of why fraud penalties should not be imposed lack coherence; if anything, these explanations' implausibility confirms our conclusions as to fraud.

Petitioners acknowledge that they earned the compensation computed on an hourly rate for the hours they worked, but insist that these amounts were not "wages". Petitioners contend that these amounts were "tips". When confronted at trial with the unlikelihood that the amount of patrons' tips precisely matched their hourly rate times hours worked, they lapsed into unresponsiveness. On opening brief and again on answering brief, petitioners contend that they "should not be subject to any civil fraud penalties on the tip income received from the casino as they have reasonable cause for their actions"; yet, they do not tell us what is this "reasonable cause".

On opening brief and again on answering brief, petitioners contend as follows:

> With respect to the audit examination involving the Balots, the IRS has failed to establish--through clear and convincing evidence--that there is an intentional wrongdoing on the part of the taxpayer. [Sic.] First, the Balots were never at any time involved with the managerial operations of the casino as they worked part-time. Therefore, they were never in any position to commit any fraudulent acts pertaining to their work in the casino.

Petitioners' fraud is their <u>own omissions</u> to report on their <u>own tax returns</u> their <u>own receipts</u> of the hourly compensation that the CIPAA Casino <u>paid to them</u>. Thus, their not being "involved with the managerial operations of the casino" is not a relevant defense to the civil tax fraud with which petitioners are charged.

In our analysis of underpayment (<u>supra</u> part II. A.) we concluded that respondent proved by clear and convincing evidence that petitioners failed to report what clearly was tip income (i.e., petitioners' shares of the patrons' tips) that was gathered, apportioned, and periodically paid to them in 1991. The foregoing evaluation of petitioners' fraudulent intentions as to hourly compensation applies with even greater force to the 1991 tip income.

We conclude, and we have found, that respondent has shown by clear and convincing evidence that the underpayments of tax that result from petitioners' failure to report (a) their hourly compensation paid to each of them by the CIPAA Casino in 1991 and 1992, and (b) their shares of the patrons' tips that the CIPAA Casino gathered, apportioned, and periodically paid to petitioners in 1991, all are due to the fraud of each petitioner.

We so hold.

C.  Amounts of Deficiencies; Nonfraudulent Causes

In parts II. A. and II. B. of this opinion, respondent had the burden of proving, by clear and convincing evidence, that there were underpayments of tax, some part of which was due to fraud; respondent carried this burden.

In this part of the opinion, petitioners have the burden of proving, by a preponderance of the evidence, that the deficiencies[12] are less than the amounts respondent determined in the notice of deficiency.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioners also have the burden of proving, by a preponderance of the evidence, that some part of the 1991 or 1992 underpayment is not due to fraud.  See sec. 6663(b).

In the absence of adequate records, respondent may employ reasonable methods of reconstructing petitioners' taxable income in a manner which clearly reflects income.  See sec. 446(b); Holland v. United States, 348 U.S. 121 (1954); Parks v. Commissioner, 94 T.C. at 658.

Although the notice of deficiency does not so state, it is evident from the record herein that respondent's notice of deficiency determinations of "Other Unreported Income" are based

---

[12]For purposes of the instant case, "deficiency" is the same as "underpayment".  Compare sec. 6211(a) with sec. 6664(a).

on use of the bank deposits method to reconstruct petitioners'
income. See supra table 2.

It is well established that bank deposits are evidence of
income where the deposits were made by the party charged with the
income or to an account controlled by the party charged with the
income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).
The premise underlying the bank deposits method of income
reconstruction is that, absent some explanation, a taxpayer's
bank deposits represent income subject to tax. See DiLeo v.
Commissioner, 96 T.C. at 868. The use of the bank deposits
method of income reconstruction has long been sanctioned by the
courts. See id.; Tokarski v. Commissioner, 87 T.C. at 77; Estate
of Mason v. Commissioner, 64 T.C. 651, 656 (1975)(and cases cited
therein), affd. 566 F.2d 2 (6th Cir. 1977). When this method is
used, respondent must take into account any nontaxable deposits
or deductible expenses of which respondent has knowledge. See
DiLeo v. Commissioner, 96 T.C. at 868.

We have held that, where respondent has the burden of proof
in a bank deposits case, e.g., where respondent has determined
that a taxpayer has committed tax fraud, then--

> Respondent can satisfy * * * [the] burden of proving
> the first prong of the fraud test, i.e., an underpayment,
> when the allegations of fraud are intertwined with
> unreported and indirectly reconstructed income in one of two
> ways. Parks v. Commissioner, 94 T.C. at 661. Respondent
> may prove an underpayment by proving a likely source of the
> unreported income. Holland v. United States, 348 U.S. 121
> (1954); Parks v. Commissioner, supra at 661; Nicholas v.

<u>Commissioner</u>, 70 T.C. [1057,] * * * 1066 [(1978)].
Alternatively, where the taxpayer alleges a nontaxable
source, respondent may satisfy * * * [the] burden by
disproving the nontaxable source so alleged.  <u>United States
v. Massei</u>, 355 U.S. 595 (1958); <u>Parks v. Commissioner</u>, <u>supra</u>
at 661.  * * * [<u>DiLeo v. Commissioner</u>, 96 T.C. at 873.]

Table 2, <u>supra</u>, summarizes respondent's revenue agent's

conclusions in analyzing petitioners' bank deposits.  On its

face, respondent's calculations seem reasonable.  But see our

notes to table 2.  Petitioners contend that the bank deposits

method "is not appropriate for use in the Petitioners' case", and

also "that the alleged excess bank deposits are from sources

representing traditional inter-family [intra-family?] and friend

transfers."

Petitioners assert as follows:

According to a review of the various court cases involving
the bank deposit method, it is clear that the bank deposit
method is most prevalently used to determine "unreported
income" of professionals, shopkeepers, and others whose
income arise largely from receipts of a business.

Petitioners stress that they "were never self-employed during tax

years 1991, 1992 and 1993;" and that they "did not operate a

business during tax years 1991-1993, nor were they ever in the

business of being 'gamblers.'"

<u>Firstly</u>, we are not aware of any doctrine that the

Commissioner may appropriately use the bank deposits method to

reconstruct income only where the taxpayer is operating a

business, nor do petitioners suggest any reason why there should

be such a doctrine.

Secondly, each petitioner testified that petitioners did not keep track of their tip income and that they should have kept records.[13]  Clearly, there was unreported tip income for 1991 and

---

[13]On answering brief, petitioners "object to the statement claiming they failed to keep adequate books and records."  They overlook their own trial testimony, as follows:

    Q    [Cohen] Can you tell the Court the amount of tips that you earned from the casino during the tax years at issue?  And that would be 1991 through 1993.

    A    [Rogelio] What I earned?

    Q    Tips.

    A    Tips. I don't know.

    Q    You don't know?  Well, didn't you keep any records of the tips?

    A    I should have because the management was telling us, you know, it's up to you to make sure, you know, to keep a record of what you receive.

    Q    You said you should have, but you didn't is that what you said?  I don't want to put words in your mouth.

    A    Yes.

              *    *    *    *    *    *    *

    Q    [Cohen] Did you tell your return preparer that you worked at the casino during 1991 through 1993?

    A    [Rogelio] Did I tell my lawyer?

    Q    No, no, no.  The return preparer, the person who did your tax return.

    A    Yes, they're aware of it.

    Q    You told them you worked there in 1991 through 1993?

                                        (continued...)

there may have been unreported income for later years.  This, alone, is sufficient to warrant the use of the bank deposits method to determine how much 1991 income was unreported and to test the comprehensiveness of petitioners' income reporting for later years.

---

[13](...continued)

    A     Uh-huh.

    Q     Okay.  Did you tell them how much income you earned at the casino?

    A     As far as my recollection, as far as '91 because we were just talking about it, I remember I told him that these are tips.

    Q     You told him what?

    A     When -- in 1991, I remember I was -- you know, I don't know.  Best of my recollection, I thought I told my accountant or the tax preparer that this is how much money I made in the casino.

    Q     But you didn't provide that return preparer with any books and records reflecting the amount of tips and wages that you earned at the casino during 1991 through 1993, right?

    A     No.  We just -- just like I said, I never kept a record.

    *     *     *     *     *     *     *

    Q     [Cohen] Did you keep any books and records related to the income that you earned with the casino back in the years at issue?

    A     [Zenaida] No, I did not.  I should have, but I did not.

Thirdly, from the testimony of the IRS revenue agent and from petitioners' trial memorandum it appears that, during the years in issue, petitioners went to Atlantic City, New Jersey, "about 4-5 times a year", and that they gambled while in Atlantic City.  Petitioners did not report gambling winnings and did not deduct gambling losses.  Since 1934, the Federal tax laws have required that nonbusiness gamblers--petitioners strenuously insist that they are not in the business of being gamblers--must report their winnings "above the line" and may deduct their losses only "below the line".  See discussion in Gajewski v. Commissioner, 84 T.C. at 982-983.  This bifurcation of gambling winnings, and losses for nonbusiness gamblers has been mandated even when it is clear that the taxpayers' losses exceed their winnings and they are not entitled to itemize their deductions-- in effect, taxing the nonbusiness taxpayers on their gross winnings.  See Johnston v. Commissioner, 25 T.C. 106 (1955). Thus, petitioners' acknowledgment that they did some nonbusiness gambling in each of the years in issue is another basis for the IRS revenue agent's belief that petitioners may have some unreported income that may be reconstructed by the bank deposits method.

Accordingly, we conclude that respondent was justified in using the bank deposits method to reconstruct petitioners' income.

Petitioners' oft-voiced contention that the excess bank deposits are from "traditional inter-family [intra-family?] and friend transfers", was not supported by evidence of record. Where there was evidence presented to respondent during the audit, respondent treated the transactions as nontaxable, as is shown in Exhibits 26-R and 39-R.  Before the Court, petitioners neither provided particulars, nor presented the testimony of relatives or friends, nor explained why those witnesses were not available.  See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioners have failed to carry their burden of proving that they are entitled to nontaxable treatment for any deposits (or parts of any deposits) in excess of what respondent already allowed.

Finally, petitioners contend as follows:

> In fact, the Taxpayers should not be subject to any civil tax penalties on the tip income received from the casino as they have reasonable cause for their actions. However, should the Tax Court determine that a civil tax penalty should be assessed against the Taxpayers based on their receipt of tip income, a fair reading of recent case law clearly establishes that the Petitioners should (at the most) only be subject to the negligence penalty under Code Section 6662.

Neither petitioner testified why he or she thought that the income (whether hourly compensation or tip income) was not subject to tax.  For that matter, neither petitioner even testified that he or she thought any category or specific item of

omitted income was not subject to tax.  The record is devoid of evidence that petitioners, or either of them, asked any tax adviser or tax-return preparer about any of the omitted items. Petitioners do not even take the trouble to describe to us what they claim to be the "reasonable cause for their actions."

We have ignored Zenaida's check-cashing activities because (1) the amounts of her fees for any year are uncertain and trivial, and (2) they may in any event be adequately dealt with under respondent's use of the bank deposits method.[14]

We hold, for respondent, that petitioners failed to show by a preponderance of the evidence that the deficiency for 1991 or 1992 is less than what respondent determined, as modified by respondent's concessions and our observations in the footnotes to table 2, supra.

We hold, for respondent, that petitioners failed to show by a preponderance of the evidence that any part of the underpayment for 1991 or 1992 was not due to fraud.

### III.  1993

For 1993, respondent determined that (1) petitioners have a tax deficiency resulting from their failure to report $10,618 of income, and (2) petitioners are liable for 20-percent negligence

---

[14]We assume that the cashed checks have been properly accounted for under the instant case's application of the bank deposits method.  See supra table 2.  Petitioners have not suggested otherwise.

penalty based on a determination that the entire amount of the deficiency is due to petitioners' negligence.

A.    Amounts of Deficiency

The 1993 deficiency that respondent determined is due entirely to application of the bank deposits method.  Supra table 2, especially notes 6 and 7.  Our comments and conclusions in the course of our analysis of the bank deposits method in Part II. C., supra, apply equally to 1993.

We hold that, except as to respondent's concessions and our comments in supra table 2, notes 6 and 7, petitioners have failed to show that respondent's determination of omitted income was excessive.

B.    Negligence

Respondent determined that petitioners are liable for a 20-percent negligence addition to tax on the entire underpayment for 1993.  Respondent contends petitioners' failure to maintain and furnish adequate records of their 1993 income-producing activities "thwarted respondent's attempt to examine petitioners' tax liability for that year."  Petitioners maintain that section 6662 does not apply because reasonable cause excuses their failure to report all of their taxable income for 1993.

Section 6662[15] imposes an accuracy-related penalty of 20

---

[15]Sec. 6662 provides, in pertinent part, as follows:

SEC. 6662. IMPOSITION OF ACCURACY-RELATED PENALTY.

(a) Imposition of Penalty.--If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

(b) Portion of Underpayment to Which Section Applies. --This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

> (1) Negligence or disregard of rules or regulations.

> \* \* \* \* \* \* \*

(c) Negligence.--For purposes of this section, the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title, [title 26, the Internal Revenue Code] and the term "disregard" includes any careless, reckless or intentional disregard.

Sec. 6664 provides, in pertinent part, as follows:

SEC. 6664. DEFINITIONS AND SPECIAL RULES.

> \* \* \* \* \* \* \*

(c) Reasonable Cause Exception.--

> (1) In general.--No penalty shall be imposed under this part [part II, relating to accuracy-related and fraud penalties] with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

percent of any portion of an underpayment that is attributable to the taxpayer's negligence.

Broadly speaking, for purposes of the provision, negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances to determine that person's income tax liability.  See ASAT, Inc. v. Commissioner, 108 T.C. 147, 175 (1997); Cluck v. Commissioner, 105 T.C. 324, 339 (1995).  Negligence includes any failure to keep adequate books and records.  See sec. 1.6662-3(b)(1), Income Tax Regs.  Petitioners have the burden of proving error in respondent's determination that the addition to tax should be imposed against them.[16]  See Little v. Commissioner, 106 F.3d 1445, 1449-1450 (9th Cir. 1997), affg. T.C. Memo. 1993-281; Korshin v. Commissioner, 91 F.3d 670, 671 (4th Cir. 1996), affg. T.C. Memo. 1995-46; ASAT, Inc. v. Commissioner, 108 T.C. at 175.

Petitioners have failed to introduce any evidence or offer any relevant argument supporting their contention that respondent erred in determining that the addition to tax under section 6662(a) applies.  The following sentence represents the extent of

---

[16]Section 7491(c), relating to burden of proof with respect to additions to tax, as enacted by sec. 3001 of the Internal Revenue Service Restructuring and Reform Act of 1998 (1998 Act), Pub. L. 105-206, 112 Stat. 685, 726, does not apply in the instant case because the examination in petitioners' case began before July 22, 1998, the effective date of sec. 7491(c).  See the 1998 Act, sec. 3001(c)(1), 112 Stat. 727.

petitioners' argument in support of their contention that reasonable cause excuses their 1993 underpayment: "In fact, the Taxpayers should not be subject to any civil tax penalties on the tip income received from the Casino as they have reasonable cause for their actions." Petitioners have not favored us with any statement as to what is the "reasonable cause for their actions." In the absence of any explanation and any evidence that, on our inspection, might constitute reasonable cause, we conclude that section 6662(a) applies.

To take account of respondent's concessions and the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.